[No. A132426. First Dist., Div. Two. Jan. 30, 2013.]

JUAN ACOSTA et al., Plaintiffs and Appellants, v.
EDMUND G. BROWN, Jr., as Governor, etc., et al., Defendants and
Respondents.

**Counsel**

Neighborhood Legal Services of Los Angeles County, Jose O. Tello, Joshua Stehlik, David Pallack; California Rural Legal Assistance, William G. Hoerger, Cynthia L. Rice, Elena Dineen, Juan Carlos Cancino; Western Center on Law & Poverty and Richard A. Rothschild for Plaintiffs and Appellants.

Kronick, Moskovitz, Tiedemann & Girard and David W. Tyra for Defendants and Respondents.

**Opinion**

**KLINE, P. J.**—Appellants, unemployed California residents previously employed as farmworkers or in other low wage or minimum wage jobs, experienced significant delays in receiving benefits due them under the California unemployment compensation program (Unemp. Ins. Code, § 100 et seq.), suffering significant hardships as a result. In 2008, they sought a writ of mandate from the San Francisco Superior Court directing the Governor

and other state officials[1] to ensure in specified ways that appellants and others eligible for such benefits receive them within the time periods specified in federal regulations. Declining to do so under a state doctrine of judicial abstention, the trial court granted respondents' motion for judgment on the writ. (Code Civ. Proc., § 1094.) Appellants timely appealed that ruling. We affirm.

## BACKGROUND

*The California Unemployment Insurance Program*

The California unemployment insurance program is part of a national program established under the Social Security Act (42 U.S.C. § 501 et seq.), the Federal Unemployment Tax Act (26 U.S.C. § 3301 et seq.) (FUTA), and the Unemployment Insurance Code (Unemp. Ins. Code, §§ 100–101). FUTA imposes a federal tax on employers based on the total wages paid employees. (26 U.S.C. § 3301; 42 U.S.C. §§ 1101, 1104.) Employers receive a credit against that federal tax for payments made to a federally approved state unemployment insurance fund which finances the actual cost of benefits provided unemployed persons. (26 U.S.C. § 3302.) Administrative costs incurred by the state are paid for by the federal government if the state complies with certain federally mandated requirements. (42 U.S.C. §§ 502, 503, 1101.) One of these requirements is the adoption of administrative measures "reasonably calculated to insure full payment of unemployment compensation when due." (42 U.S.C. § 503(a)(1).) Additionally, appeals from the denial of unemployment benefits must be heard and decided by a designated state agency with the "greatest promptness that is administratively feasible." (20 C.F.R. §§ 650.1, 650.3(a) (2012).)

In California, the unemployment insurance (UI) program consists of three phases: (1) UI claims are submitted to and initially processed by the Employment Development Department (EDD) (Unemp. Ins. Code, § 1326 et seq.); (2) any appeal from EDD's benefit determination is heard by an administrative law judge (ALJ) employed and assigned by the California Unemployment Insurance Appeals Board (CUIAB) (referred to as the "first-level appeal"); and (3) any appeal of the ALJ's determination is submitted to and decided by the appellate division of the CUIAB based upon the record, including the transcript of the hearing before the ALJ (referred to as the "second-level appeal"). (Unemp. Ins. Code, §§ 401, 404, 409.)

---

[1] In addition to the Governor, defendants also included the Director of California's Employment Development Department, the Executive Director of the California Unemployment Insurance Appeals Board, the Secretary of the Labor and Workforce Development Agency, the Director of the Department of Personnel Administration (now California's Department of Human Resources), and the State Controller.

Pursuant to the Social Security Act (42 U.S.C. §§ 503(a)(1) & (b)(2), 1302), and implementing federal regulations (20 C.F.R. §§ 640.1–640.9 (2012)), state UI programs' compliance with federal standards for prompt payment of unemployment compensation is annually reviewed by the United States Department of Labor (DOL). (20 C.F.R. § 640.6(a) (2012).) To facilitate such review, EDD and CUIAB, in conjunction with the Labor and Workforce Development Agency (which oversees six departments, boards and panels serving California businesses and workers, including EDD and CUIAB), jointly submit for DOL review and approval an annual state quality service plan reporting on their performance in the processing of UI claims and appeals. The state agencies additionally submit for review and approval quarterly "corrective action plans" describing the steps CUIAB has taken to improve performance, and identifying other methods that can be designed to achieve that goal.

Under DOL regulations prescribing the timely processing of UI claims, a state is in substantial compliance with the federal timeliness requirements if at least 87 percent of benefit payments are made within 14 days following the end of the first compensable week after filing (20 C.F.R. § 640.5 (2012)),[2] and the responsible state agency resolves "at least 60 percent of all first level benefit appeal decisions within 30 days of the date of appeal, and at least 80 percent of all first level benefit appeal decisions within 45 days." (20 C.F.R. § 650.4(b) (2012).)

*California Does Not Comply with the Federal-Timeliness Requirements*

The trial court received abundant undisputed evidence California has been unable to meet federal timeliness standards for processing UI claims and appeals for more than a decade.

The third amended petition alleges, and respondents acknowledge, that in none of the 13 months between March 31, 2008, and March 31, 2009, did EDD process 87 percent of benefit payments within 14 days following the end of the first compensable week, as required by the regulatory definition of "substantial compliance" with the federal timeliness requirements. In March 2008, it processed only 66.9 percent of such claims and in March 2009 the percentage was 70.4 percent. EDD's performance thereafter continued to be deficient. In a letter dated April 26, 2010, Jane Oates, Assistant DOL Secretary for Employment and Training, informed the Secretary of California's Labor and Workforce Development Agency (a cabinet-level agency

---

[2] The 14-day period is extended to 21 days for "non-waiting week States," which are those "whose law does not require that a non-compensable period of unemployment be served before the payment of benefits commences." (20 C.F.R. § 640.5, fn. 1 (2012).) California is not a "non-waiting week State."

which includes EDD and CUIAB) that the state had been designated by DOL as being "At Risk" with regard to its ability to fulfill federal statutory requirements applicable to the administration of its UI program, in part because California made only 62.8 percent of payments within 14 days of the first compensable week and out of the 53 states and jurisdictions, California ranks 53d for the performance year ending March 31, 2010. She also pointed out that California had failed to achieve the 87 percent regulatory standard for nine of the past 10 years.

Judging from their pleadings below and the briefs they have filed here, it appears that appellants' major concern is not EDD's delay in processing benefit payments to eligible claimants, who file no CUIAB appeal, but CUIAB's much greater delay in processing first- and second-level appeals from adverse EDD determinations. As indicated, CUIAB is required by federal regulations to resolve "at least 60 percent of all first level benefit appeal decisions within 30 days of the date of appeal, and at least 80 percent of all first level benefit appeal decisions within 45 days." (20 C.F.R. § 650.4(b) (2012)). The CUIAB's failure to meet these timelines is egregious.

As long ago as 2001, when the problem arose, the CUIAB was able to resolve only about 59.3 percent of first-level appeals within 30 days, and only 77.3 percent of first-level appeals within 45 days. The situation has since become much worse. In a declaration, Alberto Roldan, then chief ALJ and acting director of the CUIAB, described and explained the growing backlog of unresolved UI claims and the remedial actions jointly taken by CUIAB and DOL. Beginning in 2007, Roldan stated, high unemployment rates dramatically increased CUIAB's workload and diminished its ability to meet DOL's timeliness requirements. As the economy worsened and thousands of newly unemployed persons became eligible for UI benefits, federal authorities approved four extensions of the time within which the benefits must be provided. The number of appeals thereupon increased significantly. In 2007, 256,817 new appeals were filed. By 2009, the annual increase had grown to 389,194, and during the first six months of 2010, 225,621 new appeals had been filed.

These numbers, Roldan stated, "overwhelmed California's UI program." For example, he said, first-level appeal statistics dropped from about 31.1 percent of appeals disposed of within 45 days in 2007, to approximately 5.6 percent in December 2009. The average case age for first-level appeals went from 25 days in June 2005 to 57 days in August 2009. At the end of June 2010, it had improved to 46 days.

CUIAB's ability to process first-level appeals was also undermined when, on July 1, 2009, in response to an extended budgetary impasse, Governor Arnold Schwarzenegger directed state employees, including CUIAB staff, to take three furlough days per month through June 2010. At the outset, it was projected that the mandated furloughs would result in a 14 percent reduction in the worktime available to process appeals, reducing the number of cases CUIAB would be able to resolve by 8,620 cases per month. On February 23, 2012, we granted respondents' motion for judicial notice of the fact that, insofar as it related to employees of EDD and the CUIAB, the furlough program implemented in 2009 ended on July 28, 2010, when then Governor Arnold Schwarzenegger issued Executive Order No. S-12-10, which exempted those employees from the program.[3]

In response to the worsening situation DOL, CUIAB and EDD intensified their collaborative corrective efforts. On February 5, 2010, after reviewing these efforts, DOL issued a 10-page study entitled "California Unemployment Insurance Appellate Board Review Report," a copy of which was received in evidence by the trial court. The report identified DOL's "concerns" and made responsive recommendations.

Several of these concerns sufficiently illustrate the nature and consequences of the many problems DOL perceived. A major DOL concern was that ALJ reversals of the denial of benefits, or determinations of the amount of overpayment where denials were upheld, were not communicated, or "transferred," by a CUIAB "appeals office" to an "adjudication center," on average, for 18 days, which is much longer than the five days most states take to act on such administrative decisions. The DOL recommended rectification of the problem by electronically transferring ALJ decisions to the adjudication centers. Another DOL concern was that although hearings are conducted entirely by telephone in many states, including large ones like Texas and Florida, and the practice has been upheld by the courts and shown to save significant amounts of time and money, in California only 10 percent of hearings are conducted by telephone. DOL recommended that "CUIAB should conduct a higher percentage of hearings by telephone." DOL was also concerned that "decision processing from dictation to the typing pool and

---

[3] Respondents asked us to take judicial notice that "the furlough program, as implemented in 2009, has ended and California state employees, including employees at EDD and CUIAB are no longer being furloughed." Appellants opposed the motion, pointing out that there is no end date by which such employees must use "banked" furlough time. Respondents conceded the point, as the only present requirement is that "banked" time must be utilized before a state employee separates from his or her state employment. Given our resolution of this case, we find it unnecessary to inquire whether the furlough program may in the future adversely affect state efforts to comply with the federal timeliness requirement.

back" could take as long as 55 days. DOL recommended diminishing the time by "[g]reatly expanding the use of voice-to-text software," and noted that DOL had recently awarded the CUIAB $147,679 to provide 60 worksta- tions with the necessary hardware and software to facilitate use of this technology. DOL was also critical of the fact that ALJ caseloads were inflexibly determined by collective bargaining agreements and could not be easily adjusted to accommodate "swings in the workloads." Its report recom- mends that the negotiation of these contracts should provide for such flexibility through the adoption of "maximum workloads." Finally, DOL expressed concern about the relationship between EDD and the CUIAB, and recommended that the agencies "work collaboratively to improve processes and implement a continuous improvement cycle to gather feedback from the field and to evaluate any processes implemented."

When Assistant DOL Secretary Oates informed California it had been placed "At Risk," nearly three months after DOL issued its report, she noted that the percentage of appeals decided within 30 days was 2.5 percent, far below the 60 percent federal standard, ranking California last among the 50 states. She also observed that California had failed to meet the federal promptness standard since 2002, demonstrating that the state's performance "has continued to be consistently and significantly below acceptable perfor- mance standards . . . ."

Hilda Solis, Secretary of the DOL, has declined to pursue federal defund- ing of nonconforming state UI programs—the only sanction available to the federal government to insure compliance with its timeliness regulations (42 U.S.C. § 503(b))—because she feels it would be inimical to the interests of the beneficiaries of such programs, and DOL is instead " 'working to avoid such action and to obtain states' compliance with our policies.' "

*The Contentions of the Parties*

Emphasizing the desperate straits in which they and many thousands of other struggling laid-off workers have been placed by the long delays in the processing of UI benefit claims, and the ineffectuality of DOL's prolonged effort to induce and enable CUIAB to come into compliance with federal timeliness requirements, appellants contend that the only meaningful way compliance can be achieved is a judicial mandate compelling compliance. They sought a writ directing the CUIAB "to develop a plan and take all steps necessary to come into compliance with the federal requirement that it insure full payment of unemployment compensation when due and to comply with the federal timeliness standards with respect to first level appeals of denials

of unemployment insurance benefits as set out in 20 C.F.R. section 650.4(b) within six months from the date of issuance of the writ." Appellants also asked the court to require CUIAB "to submit monthly reports to the Court and counsel for [appellants] detailing the progress it has made to insure compliance."

This remedy is appropriate, they say, because the CUIAB has a clear and present ministerial duty to ensure full payment of unemployment compensation when due, its performance of that duty indisputably falls far below the regulatory definition of "substantial compliance," and monitoring CUIAB's performance for six months would neither usurp DOL's regulatory authority nor engage the court in complex economic policymaking or interfere in any other matters best left to an administrative agency or a legislative body.

Relying on *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292 [64 Cal.Rptr.3d 250] (*Alvarado*), and the case law it relied upon, respondents contend that the trial court properly abstained from adjudicating appellants' claim because granting the relief sought and monitoring and enforcing compliance by a judicial order would be unnecessarily burdensome, given the availability of more effective means of administrative redress, and usurp or interfere with the functions of DOL with respect to matters involving complex economic and other policy issues unsuitable for judicial determination.[4] (*Alvarado*, at p. 1298 and cases there cited.)

*The Trial Court's Ruling*

After a hearing on November 16, 2010, the court granted respondents' motion for judgment on the writ (Code Civ. Proc., § 1094) and ordered appellants' competing motion for entry of writ of mandate as to respondent CUIAB (Code Civ. Proc., § 1085) off calendar as moot. The parties agreed that because the ruling was based on a purely legal determination— application of the principle of judicial abstention—a statement of decision was not required. The court did not explain its ruling, but the parties infer, as do we, that it found the abstention analysis set forth in *Alvarado, supra,* 153 Cal.App.4th 1292, persuasive and applicable to this case.

---

[4] Respondents also maintain appellants (1) have failed to demonstrate that the federal timeliness standards create a mandatory ministerial duty, arguing that the standards "are simply triggers for a broad remedial scheme supervised by [DOL]," and recognize that, as stated in 20 Code of Federal Regulations part 640.3 (2012), "[f]actors reasonably beyond a State's control may cause its performance to drop below the level of adequacy expressed in the . . . . criteria for substantial compliance"; (2) have no clear and present beneficial interest in the performance of the ministerial duty they assert; and (3) raise issues that are either moot or based on stale facts. Because we uphold the trial court's decision to abstain, we have no occasion to determine whether the relief appellants seek would otherwise be warranted and therefore find it unnecessary to address any of these issues.

## STANDARD OF REVIEW

A trial court decision to abstain is reviewed for abuse of discretion. As stated in *Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237 [102 Cal.Rptr.3d 615] (*Blue Cross*), in which the defendant sought judicial abstention by means of a petition for writ of mandate, " '[a] reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice. . . . "It is fairly deducible from the cases that one of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' [Citation.]" (*Id.* at p. 1258, quoting *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193], citation omitted, quoting *Loomis v. Loomis* (1960) 181 Cal.App.2d 345, 348–349 [5 Cal.Rptr. 550].)

## DISCUSSION

### I.

As appellants emphasize, and the United States Supreme Court made clear in *California Human Resources Dept. v. Java* (1971) 402 U.S. 121 [28 L.Ed.2d 666, 91 S.Ct. 1347] (*Java*), the statutory requirement that benefits be paid "when due" (42 U.S.C. § 503(a)(1)) is the fundamental underpinning of the UI program.

The appellees in *Java* challenged on statutory and constitutional grounds a California statute suspending payment of UI benefit payments upon an employer's appeal, after an initial determination of eligibility for benefits, pending de novo consideration by an appeals board referee. At that time, the processing of such an appeal in this state, from the date of filing to the date of mailing the decision or dismissal, took between six and seven weeks. (*Java, supra,* 402 U.S. at p. 128.) A three-judge court concluded that the delay was defective on both statutory and constitutional grounds, and granted appellees' motion for a preliminary injunction, ordering the State of California not to suspend UI benefits because an eligibility determination has been appealed. In an opinion by Chief Justice Burger, the Supreme Court affirmed the judgment of the district court on the ground that the California statute was

inconsistent with the provision of the Social Security Act requiring payment of UI compensation "when due." (42 U.S.C. § 503(a)(1).) According to the court, "getting money into the pocket of the unemployed worker at the earliest point that is administratively feasible" "is what the Unemployment Insurance program was all about." (*Java*, at p. 135.) "Probably no program could be devised to make insurance payments available precisely on the nearest payday following the termination," the court observed, "but to the extent that this was administratively feasible this must be regarded as what Congress was trying to accomplish." (*Id.* at p. 130.)

Respondents acknowledge both the importance of the federal timeliness requirements and California's noncompliance. By way of explanation, they point out that the state's UI program, by far the largest in the nation, is difficult to administer in the best of circumstances. The program is governed by an intricate mosaic of complex state and federal statutes and regulations, administered by multiple state agencies employing more than 10,000 employees, and serves a huge and diverse workforce, including numerous seasonally employed workers who submit frequent claims. The problems that historically hindered the prompt payment of benefits and expeditious appeals from the denial thereof were profoundly exacerbated by the national economic recession that began in 2008, which led to "skyrocketing" UI claims that quickly overwhelmed the program. In 2007, California's unemployment rate was approximately 5.3 percent. By 2008, the annualized unemployment rate rose to about 7.3 percent, a 38 percent increase over the previous year. By 2009, the annualized rate rose to approximately 11.4 percent, a 56 percent increase over the previous year and a 115 percent increase over the unemployment rate in 2007. In August 2010, shortly before the present petition was filed, the state unemployment rate rose to 12.4 percent. Rising unemployment increased the workloads of the EDD and CUIAB so dramatically that DOL's timeline targets quickly became unattainable. For example, during a two-year period between 2007 and 2009, initial claims for benefits more than doubled, from approximately 2,476,682 to approximately 6,472,824.[5]

The chief issue in this case is not whether respondents' administration of the UI program complies with the timeliness requirements specified by the Social Security Act and implementing regulations, as it clearly does not,[6] but whether the remedy for respondents' manifest failure to comply with those

---

[5] The record indicates that California is far from the only state unable to meet the adjusted target time periods set by DOL as a result of the economic downturn. DOL data shows that in 2007, there were 44 states at or above 87 percent of initial claims paid within DOL's adjusted timeframe of 14 to 21 days. Just three years later, in the quarter ending September 30, 2010, only 14 states met these criteria.

[6] Respondents concede the point but argue in their brief that since April 2010, when DOL declared California "[a]t [r]isk" for not being able to meet the federal timeliness requirements, the state's performance in processing UI appeals "improved dramatically," and cited statistics

requirements should be devised, monitored and enforced administratively by DOL or judicially by the courts of this state. The legal dispute focuses chiefly on the application to this case of the abstention doctrine analyzed and applied in *Alvarado, supra*, 153 Cal.App.4th 1292.

■ The plaintiff in *Alvarado, supra*, 153 Cal.App.4th 1292, purporting to act as a private attorney general, filed a class action under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (the UCL) seeking restitution and injunctive relief to require owners and operators of skilled nursing and intermediate care facilities to comply with certain nursing hour requirements prescribed in the Health and Safety Code and enforced by the State Department of Health Care Services (DHCS). The trial court sustained the demurrer of one of the defendants without leave to amend and entered judgment in favor of all defendants. The Court of Appeal affirmed, finding abstention proper. The court held that judicial intervention in areas of complex economic policy is inappropriate because such issues fall within the sphere of the Legislature or administrative agencies, explaining that courts "have 'neither the power nor the duty to determine the wisdom of any economic policy,' " which " 'function rests solely with the Legislature' "[7] (*Alvarado*, at p. 1298, quoting *Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 454 [55 P.2d 177]), and should not "assume the functions of an administrative agency" or "interfere with the functions of an administrative agency." (*Alvarado*, at p. 1298, citing *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 642 [39 Cal.Rptr.3d 62], *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 218 [27 Cal.Rptr.2d 396] and *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301–1302 [22 Cal.Rptr.2d 20].)

■ *Alvarado* also emphasized that granting injunctive relief in cases involving complex economic issues burdens the courts unnecessarily when other remedies are available. For this proposition, the *Alvarado* court relied upon *Diaz v. Kay-Dix Ranch* (1970) 9 Cal.App.3d 588 [88 Cal.Rptr. 443] (*Diaz*), in which the court declined to grant injunctive relief prohibiting ranchers from employing illegal immigrants because a more effective federal

supporting this claim. They also argued that the performance data appellants relied upon is more than a year old and therefore "stale." In response, appellants have asked us to take judicial notice of information obtained from a DOL Web site which assertedly "demonstrates that California remains out of compliance with the timeliness standards." Because this information was not before the trial court and is not germane to the dispositive issue we address, the request for judicial notice is hereby denied.

[7] The discussion of abstention in *Alvarado, supra*, 153 Cal.App.4th 1292 is ostensibly limited to application of the doctrine in UCL cases, but appellants provide no reason the doctrine should not apply as well in non-UCL cases seeking injunctive relief where, as here, the case involves complex economic and/or political issues, the nature of the relief sought would uncommonly burden the court, and an alternative remedy is available.

remedy was available from the federal immigration and naturalization service, which comprehensively controls the admission of foreign workers as immigrants. *Alvarado* relied upon *Diaz* as an example of equitable abstention.[8] (*Alvarado, supra,* 153 Cal.App.4th at p. 1302.) "The [*Diaz*] court explained that a single trial court may have to issue dozens of injunctions, creating a network of injunctions to cover growers in rural counties. The trial courts would then have to enforce the injunctions through contempt hearings. ([*Diaz,*] at p. 599.) The court stated: 'Thus, whatever the legal theory underlying the injunction, the court must compare the effects of granting and withholding it and, in that connection, consider the comparative availability and advisability of other forms of amelioration.' " (*Alvarado,* at p. 1302, quoting *Diaz,* 9 Cal.App.3d at p. 593.)

In *Alvarado,* the governing statute, Health and Safety Code section 1276.5 (section 1276.5), directed DHCS to " 'adopt regulations setting forth the minimum number of equivalent nursing hours per patient required in skilled nursing and intermediate care facilities, subject to the specific requirements of Section 14110.7 of the Welfare and Institutions Code' "; provided, however, that notwithstanding the latter statute or any other provision of law, " 'the minimum number of actual nursing hours per patient required in a skilled nursing facility shall be 3.2 hours, except as provided in [Health & Safety Code] Section 1276.9.' " (*Alvarado, supra,* 153 Cal.App.4th at p. 1303, italics omitted.) Section 1276.5, subdivision (b)(1), also included a complicated definition of "nursing hours"—i.e., "the number of hours of work performed per patient day"—that differed according to the type of provider (registered nurses, licensed vocational nurses, licensed psychiatric technicians, aides, nursing assistants, orderlies) and type of facility in which care was provided. The court concluded that calculating nursing hours per patient would require the trial court to undertake regulatory powers better performed by the DHCS.

Noting that section 1276.5 was a regulatory statute that the Legislature intended DHCS to enforce, the court felt that "[a]djudicating this class action controversy would require the trial court to assume general regulatory powers

---

[8] Appellants maintain "*Diaz* was not an abstention case" because the court engaged only in a "balancing of the equities related to issuing an injunction, not an application of the abstention doctrine." It is true that the *Diaz* court balanced the equities of issuing an injunction against those of declining to do so, and did not refer expressly to a doctrine of abstention, nor even use the words "abstain" or "abstention." The opinion nevertheless provides a theory of abstention—i.e., that a court asked only to award some form of equitable relief, as opposed to damages, has a court of equity's discretion to abstain—that has come to be called "the equitable abstention doctrine." (See *Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609 [145 Cal.Rptr.3d 709] (*Shuts*).) *Alvarado* is not alone in considering *Diaz* an abstention case. (See, e.g., *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 523 [213 Cal.Rptr. 247, 698 P.2d 150] (*Naegele*) ["The sound counsel of the *Diaz* decision . . . mandates state abstention in reliance on federal enforcement in this case."].)

over the health care industry through the guise of enforcing the UCL, a task for which the courts are not well equipped." (*Alvarado, supra,* 153 Cal.App.4th at pp. 1301–1304, citing *Samura v. Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at pp. 1301–1302.) The court explained, "the DHCS is better equipped to determine compliance with the statute. Section 1276.5, subdivision (a), requires that a skilled nursing facility must provide a minimum of 3.2 nursing hours per patient day. However, subdivision (a) contains an exception, referring to section 1276.9, subdivision (a), which states that '[a] special treatment program service unit distinct part shall have a minimum 2.3 nursing hours per patient per day.' Subdivision (b) of section 1276.9 defines a ' "special treatment program service unit distinct part" ' as 'an identifiable and physically separate unit of a skilled nursing facility or an entire skilled nursing facility that provides therapeutic programs to an identified mentally disordered population group.' Further complicating matters, subdivision (d) of section 1276.9 provides: 'A special treatment program service unit distinct part shall also have an overall average weekly staffing level of 3.2 hours per patient day, calculated without regard to the doubling of nursing hours, as described in paragraph (1) of subdivision (b) of Section 1276.5, for the special treatment program service unit distinct part.' " (*Alvarado,* at p. 1305.) A court monitoring compliance with, and enforcing, section 1276.5 would thus have to determine on a classwide basis whether a particular skilled nursing or intermediate care facility is governed by section 1276.5 or section 1276.9; classify employees into different categories, in order to calculate nursing hours for each facility involved in the case; calculate the hours the employees worked; and, because the formulas for calculating nursing hours depend on the type of skilled nursing facility, determine the size, configuration and licensing status of each regulated facility. (*Alvarado, supra,* 153 Cal.App.4th at pp. 1305–1306.)

The *Alvarado* court concluded that the foregoing tasks are "better accomplished by an administrative agency than by trial courts." (*Alvarado, supra,* 153 Cal.App.4th at p. 1306.) Like *Diaz, Alvarado* thus stands for the proposition that abstention is appropriate when "enforcement of the subject law would be ' "more orderly, more effectual, less burdensome to the affected interests." ' " (*Alvarado, supra,* 153 Cal.App.4th at p. 1298, quoting *Naegele, supra,* 38 Cal.3d 509, 523, quoting *Diaz, supra,* 9 Cal.App.3d at p. 599.)

Appellants maintain that the circumstances warranting abstention in *Alvarado* are not present here, as ruling on the merits would not require individualized determinations or calculations with respect to specific unemployment claimants nor usurp the regulatory functions of DOL. As appellants put it, "[t]he trial court was merely asked to find that California is out of compliance with clear and unambiguous standards for processing first level

appeals of unemployment benefits and to order compliance with these standards." Appellants also distinguish *Alvarado* on two other grounds. First, they argue that unlike the administrative agency deferred to in *Alvarado*, DOL cannot be deemed better equipped than the court to enforce compliance with the subject statutes, because DOL has irresponsibly failed to order respondents to comply with the federal timeliness requirements for the past decade, and the trial court could quickly and easily make such an order. Second, in *Alvarado* the trial court would have had to issue networks of injunctions across the state, whereas in this case "the requested relief will simply tell CUIAB to comply with [the] law." As we will explain, these distinctions are insufficient to undermine the application of *Alvarado*'s reasoning to this case.

■ Additionally, our conclusion is not altered by the fact that, unlike *Alvarado* and many other abstention cases, there is no claim in this case under the UCL—which has been declared an inappropriate basis upon which to "drag a court of equity into an area of complex economic policy." (*Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 795 [114 Cal.Rptr.2d 623]; see *Willard v. AT&T Communications of California, Inc.* (2012) 204 Cal.App.4th 53, 59 [138 Cal.Rptr.3d 636], and cases there cited.) The absence of such a claim does not diminish the force of the principles upon which *Alvarado* rests because, like the relief sought in *Alvarado* under the UCL, the relief sought in this case—enjoining compliance with the federal timeliness requirement—is in the nature of equitable relief. As has been noted, " 'while mandate is ordinarily classed as a legal remedy it has the effect of an equitable interference supplementing the deficiencies of the common law . . . largely controlled by equitable principles' . . . ." (*Wallace v. Board of Education* (1944) 63 Cal.App.2d 611, 617 [147 P.2d 8], citation omitted; see *Bruce v. Gregory* (1967) 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, .423 P.2d 193]; *Dowell v. Superior Court* (1956) 47 Cal.2d 483, 486 [304 P.2d 1009].)

Like section 1276.5, the statute involved in *Alvarado, supra,* 153 Cal.App.4th 1292, the federal laws we are concerned with are also "regulatory statutes." As earlier noted, the pertinent provisions of the Social Security Act require that state law must provide "[s]uch methods of administration . . . as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due" (42 U.S.C. § 503(a)(1)), and that "[w]henever the Secretary of Labor . . . finds that there is a failure to comply substantially with [that requirement] [he or she] shall notify [the responsible State agency] that further payments will not be made to the State until [s]he is satisfied that there is no longer any such failure" (42 U.S.C. § 503(d)(3)). As we have said, the regulations specify that a state

is in "substantial compliance" if at least 87 percent of benefit payments are made to eligible claimants within 14 days following the end of the first compensable week after filing (20 C.F.R. § 640.5 (2012)) and the responsible state agency resolves "at least 60 percent of all first level benefit appeal decisions within 30 days of the date of appeal, and at least 80 percent of all first level benefit appeal decisions within 45 days" (20 C.F.R. § 650.4(b) (2012)).

■ Federal regulations authorizing DOL to monitor and enforce state compliance with the foregoing provisions of the Social Security Act (20 C.F.R. § 640.1 et seq. (2012)) provide that when the average performance of a state UI program over a 12-month period ending on March 31 fails to comply with the timeliness criteria, the responsible state agency must submit to DOL an "annual benefit payment performance plan," which is "subject to continuing appraisal during the period it is in effect" and "subject to modification from time to time as may be directed by the Department of Labor." (20 C.F.R. § 640.7(a) (2012).) When directed by DOL, a responsible state agency must also submit a "periodic benefit payment performance plan" which "may be in addition to, or a modification of an annual plan and may be required even though an annual plan covering the same period is not required." (20 C.F.R. § 640.7(b) (2012).) A periodic plan is also "subject to continuing appraisal during the period it is in effect, and . . . modification from time to time as may be directed by [DOL]." (20 C.F.R. § 640.7(b) (2012).) Annual and periodic plans are required to "set forth such corrective actions, performance and evaluation plans, and other matters as the [DOL] directs, after consultation with the State agency." (20 C.F.R. § 640.7(c) (2012).)

For first-level appeals performance, the regulations specify that "[n]o later than December 15 of each year, each State shall submit an appeals performance plan showing how it will operate during the following calendar year so as to achieve or maintain the issuance of at least 60 percent of all first level benefit appeals decisions within 30 days of the date of appeal, and 80 percent within 45 days." (20 C.F.R. § 650.5 (2012).)

■ With respect to enforcement, the implementing regulations provide that "when a State agency fails, for an extended period," to meet the timeliness standards and criteria specified in the pertinent federal regulations (20 C.F.R. §§ 640.4, 640.5 (2012)), the DOL "shall pursue any of the following remedial steps that it deems necessary before considering application of the provisions of § 640.2 [(which authorizes the Secretary of Labor to defund the responsible state agency)]: (1) Initiate informal discussion with State agency officials . . . . (2) Conduct an evaluation of the State's benefit

payment processes and analyze the reasons for the State's failure to meet the standard. (3) Recommend specific actions for the State to take to improve its benefit payment performance. (4) Request the State to submit a plan for complying with the standard by a prescribed date. (5) Initiate special reporting requirements for a specified period of time. (6) Consult with the Governor of the State regarding the consequences of the State's noncompliance with the standard. (7) Propose to the Governor of the State and on an agreed upon basis arrange for the use of expert Federal staff to furnish technical assistance to the State agency with respect to its payment operations." (20 C.F.R. § 640.8(a)(1)–(7) (2012).) Regarding the performance standards applicable to first-level appeals, the DOL must determine whether the state's "[a]nnual appeals performance plan" will achieve the issuance of at least 60 percent of all first-level appeals decisions within 30 days of the date of appeal, and 80 percent within 45 days. (20 C.F.R. §§ 650.5 (2012).)

After the foregoing remedial steps have been exhausted, if a state fails to take appropriate action, or otherwise fails to meet the timeliness standard specified in Code of Federal Regulations part 640.4, and, after notice and a hearing, the Secretary of Labor finds that the state agency's administration of the state UI program is not "reasonably calculated to insure full payment of unemployment compensation when due" (42 U.S.C. § 503(a)(1)), "the Secretary of Labor shall notify such State agency that further payments will not be made to the State until the Secretary of Labor is satisfied that there is no longer any such . . . failure to comply" (42 U.S.C. § 503(b)(2); 20 C.F.R. § 640.2 (2012)).

As we have said, appellants seek judicial relief because they believe the remedial steps and enforcement actions DOL has taken pursuant to the foregoing regulations have had no effect. Appellants' complaint that DOL's enforcement of the federal timeliness requirements is ineffectual, and judicial enforcement is therefore essential, appears to be based solely on Secretary of Labor Hilda Solis's reported statement (in a letter to a member of Congress from Cal.) that the only sanction available to the federal government "is to withhold money from the unemployment compensation program" (see 42 U.S.C. § 503(b)) and she believes "this action could be detrimental to both state workers and those who rely on the services they provide." Secretary Solis is instead "working to avoid such action and to obtain states' compliance with our policies."

Appellants are not merely asking the court to compel CUIAB to comply with the mandate of the Social Security Act to pay UI compensation "when due." In reality they are asking the trial court to replicate administrative responsibilities imposed by law on the DOL. The proposed order directing issuance of a writ of mandate appellants submitted to the trial court commanded the CUIAB to, among other things, "[d]evelop a plan and take all

steps necessary to ensure that no later than six months from the date of issuance of the writ of mandate the State of California shall come into compliance with the federal requirement that it ensure full payment of unemployment insurance when due and to comply with the federal timeliness standards with respect to first-level appeals of denials of unemployment insurance benefits" and to submit said plan to the court and counsel for appellants within 30 days from the issuance of the writ and thereafter submit monthly reports to the court and counsel "detailing the progress it has made to insure compliance." Appellants' proposed order also directed respondents to "file a return to the writ on or before March 16, 2011, showing what they have done to comply with the writ." The relief sought essentially transfers to the trial court the administrative responsibilities of DOL under 20 Code of Federal Regulations parts 640.7 and 650.5 (2012).[9] That is, the court would impose on CUIAB the duty to periodically submit the functional equivalent of "benefit payment performance plans" explaining the "corrective actions" it planned to take in order to come into compliance with the timeliness requirements, and continuously appraise the plans and evaluate the CUIAB's performance. If, as appellants vigorously argue, they are "simply" asking the court to order CUIAB to comply with the federal timeliness requirements, there would have been no reason for them to provide the court six months in which to bring this about. Appellants proposed such a period because the periodic evaluation of the agency's plans and monitoring of its performance that they asked the court to engage in would obviously be very time consuming.

█ The record provides no reason to think the trial court is in a better position than DOL to bring CUIAB into compliance, let alone to think the court could accomplish this complex task within six months. All the evidence is to the contrary. Unlike DOL, the court lacks the expertise and resources

---

[9] 20 Code of Federal Regulations part 640.7(a) (2012) provides in material part as follows: "An annual benefit payment performance plan shall be submitted by a State agency to the Department of Labor when average performance over a 12-month period ending on March 31 of any year does not meet the [timeliness] criteria specified in § 640.5."

Part 640.7(b) (2012) states that "[a] periodic benefit payment performance plan shall be submitted by a State agency when directed by the Department of Labor. A periodic plan may be in addition to, or a modification of an annual plan and may be required even though an annual plan covering the same period is not required. A periodic plan shall be subject to continuing appraisal during the period it is in effect, and shall be subject to modification from time to time as may be directed by the Department of Labor."

Part 640.7(c) (2012) declares that "[a]n annual plan or periodic plan shall set forth such corrective actions, performance and evaluation plans, and other matters as the Department of Labor directs, after consultation with the State agency."

20 Code of Federal Regulations part 650.5 (2012) provides: "No later than December 15 of each year, each State shall submit an appeals performance plan showing how it will operate during the following calendar year so as to achieve or maintain the issuance of at least 60 percent of all first level benefit appeals decisions within 30 days of the date of appeal, and 80 percent within 45 days."

necessary to evaluate CUIAB's benefit payment processes and performance, to analyze the reasons for the state's failure to meet the federal timeliness standards, and to recommend appropriate remedial action. Nor can the court furnish CUIAB any technical assistance it may need comparable to that DOL is authorized to provide. (20 C.F.R. § 640.8(a)(7) (2012).) Clearly, the record provides a basis for concluding that the trial court lacked the knowledge and resources necessary to perform the administrative responsibilities appellants ask us to impose on it.

In support of their contention that abstention is inappropriate in this case, appellants rely on state and federal cases in which trial courts issued orders assertedly comparable to the order they proposed here, directing state agencies to comply with federal requirements. (*Blue Cross, supra*, 180 Cal.App.4th 1237; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471 [104 Cal.Rptr.3d 545]) (*Arce*); *Shuts, supra*, 208 Cal.App.4th 609; *Robertson v. Jackson* (E.D.Va. 1991) 766 F.Supp. 470 (*Robertson*); *Dunn v. New York State Dept. of Labor* (S.D.N.Y. 1979) 474 F.Supp. 269 (*Dunn*).) None persuades us abstention in this case was an abuse of discretion.

*Blue Cross, supra*, 180 Cal.App.4th 1237, was a suit against a health insurer and a managed health care provider alleging claims under the UCL and the false advertising law (FAL), concerning coverage rescission practices. The Court of Appeal upheld the trial court's decision not to abstain for several reasons. First, the city attorney was not asking the court to assume or interfere with the functions of an administrative agency, but simply to grant relief for business practices made unlawful by the UCL and the FAL, and granting that relief would not interfere in any way with the functions of the two relevant state regulatory agencies. (*Blue Cross*, at pp. 1258–1259.) Second, the suit did not call upon the court to determine complex economic policy, only to enforce policy decisions already made by the Legislature. Third, the city attorney was not seeking injunctive relief that would be unnecessarily burdensome for the court to monitor or enforce. Additionally, the complaint sought not just injunctive relief but also restitution and civil penalties.

None of the reasons justifying rejection of abstention in *Blue Cross* apply to the present case. First of all, as we have explained, appellants *are* asking the court to interfere with and assume the responsibilities of the DOL, and they have not shown that any remedy the court could provide would be more effective than those available to the DOL. Secondly, calling upon the court to carry out the type of regulatory functions DOL is charged with performing requires considerably more than was asked of the *Blue Cross* court, which simply had to determine whether the defendant violated the UCL and, if so, to grant statutorily prescribed relief. Thirdly, appellants *are* asking the court

to involve itself in complex economic matters. The only enforcement tool available to the trial court but not to DOL—which appellants never explicitly mention but of which they must be aware—is the contempt power. (Code Civ. Proc., § 1209, subd. (a)(5) ["[d]isobedience of any lawful judgment, order, or process of the court" constitutes a "contempt[] of the authority of the court"].) Perhaps the most daunting question adjudication of this case would present is the propriety of exercising the judicial power to hold a state official in contempt of court—which is punishable by fine or imprisonment (*id.*, § 1218)—for the nonwillful failure to comply with a judicial order. Unemployed workers who fail to receive UI benefits when due are not the only aggrieved citizens whose legitimate needs our economically distressed state is now unable to meet. The uncertain consequences and efficacy of holding a state official in contempt of court, due to the state's financial and administrative inability to timely pay unemployment insurance to eligible claimants during a recession in which the demands on the agency are extraordinarily high and the resources of the state unusually strained,[10] present complex economic and political questions judicial officers do not often confront, and for which they are not well prepared. If, as may well be the case, CUIAB's failure to comply is the result of underfunding by the Legislature, the remedy is one that only the Legislature can provide. Finally, the present case seeks only injunctive relief.

*Arce, supra,* 181 Cal.App.4th 471, is also inapposite. In that case, an autistic child proposed a class action suit under the UCL against his health care service plan, alleging it breached its contract and violated the California Mental Health Parity Act (Health & Saf. Code, § 1374.72), in that it categorically denied coverage to children with autism spectrum disorders for "applied behavior analysis therapy" and "speech therapy" (*Arce,* at p. 499). The trial court sustained the plan's demurrer to the UCL claim without leave to amend based on the doctrine of judicial abstention (and also on the lack of commonality among class members), primarily because it believed that the requested relief would require it to individually determine what treatments were " ' "medically necessary" ' " for a large group of persons. (*Arce,* at p. 499.)

Reversing, the Court of Appeal held that the trial court was not called upon to make individualized judicial determinations of medical necessity, but rather to perform the judicial function of contract and statutory interpretation, interpreting relevant terms of the health plan contract to determine whether

---

[10] It is true, as appellants point out, that the UI program is primarily funded by the federal government, but not exclusively. (See *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252 [128 Cal.Rptr.3d 711].) Moreover, the furlough program, which exacerbated the state's inability to timely pay UI benefits, was an effort to align the provision of state services with the state's diminishing financial resources.

the two therapies at issue were covered, and provisions of the governing statutes to decide whether the therapies came within the statutory definition of "health care services" and whether they were required to be provided only by specified professionals. (*Arce, supra,* 181 Cal.App.4th at p. 500.) The court found no indication that granting the relief sought "would be unnecessarily burdensome for the trial court," or that the court was being asked "to issue a network of injunctions across the state or to engage in a long-term monitoring process to ensure compliance with its order," or that adjudication of Arce's claim would "call upon the court to determine complex issues of economic or health policy." (*Id.* at p. 500.) Nor would the relief sought "require the trial court to assume or interfere with the functions of an administrative agency," because the statutory administrative remedies were not exclusive and a denial of coverage for health care services in violation of the Mental Health Parity Act could be enjoined as unlawful conduct under the UCL. (181 Cal.App.4th at p. 501.) Unlike *Arce,* as we have discussed, the relief sought in the present case would require the court to engage in evaluation and remediation in areas of administrative, not judicial, expertise, and to decide complex issues of economic policy.

*Shuts, supra,* 208 Cal.App.4th 609, like *Alvarado, supra,* 153 Cal.App.4th 1292, was a suit alleging inadequacy of the staffing levels at a skilled nursing facility in violation of Health and Safety Code section 1276.5. Unlike *Alvarado,* the *Shuts* court found abstention inappropriate because the determination whether a skilled nursing facility satisfies its obligation under section 1276.5 " '[did] not appear to implicate technical or policy determinations usually reserved to an administrative agency' " and the plaintiffs' claims posed no unusual issues suggesting a need for the expertise of CDPH (State Department of Public Health). (*Shuts,* at p. 621, quoting *Wehlage v. EmpResHealthcare, Inc.* (N.D.Cal. 2011) 791 F.Supp.2d 774, 787.) The *Shuts* court noted that since *Alvarado* was decided, CDPH had provided administrative guidance on the standard at issue and how it should be calculated. (*Shuts,* at p. 622.) Further, the plaintiffs in *Shuts* relied upon a statute, Health and Safety Code section 1430, subdivision (b), not relied upon in *Alvarado,* establishing a private right of action, making it clear that the Legislature intended courts to resolve such actions. (*Shuts,* at p. 624.) Finally, *Shuts* noted that even if abstention might otherwise be appropriate, the complaint set forth nonequitable claims for relief, including damages, that were not presented in *Alvarado* and not subject to dismissal under the doctrine of equitable abstention. (*Id.* at pp. 624–625.) Here, appellants rely purely on a regulatory statute, their writ petition seeks only injunctive relief, equitable principles are at play, and granting the relief sought would unquestionably require " 'technical or policy determinations usually reserved to an administrative agency.' " (*Id.* at p. 621.)

The two federal cases appellants rely on, although factually closer to the case before us, also fail to persuade us abstention was improper here.

*Robertson, supra,* 766 F.Supp. 470, was a suit challenging Virginia's administration of the federal food stamp program which, among other things, requires that the designated state agency ensure that an applicant household's eligibility for food stamp benefits is determined, and eligible households are provided benefits, within 30 days of the date of application. The evidence showed widespread and serious violations of the 30-day processing standard applicable to regular applications, and even more "shameful" and "shocking" deficiencies in the processing of those applications entitled to expedited processing. Delays were due to both a steady and dramatic increase in the number of applications and the fact that the responsible state agency's authorization of and funding for staff positions had not kept pace with its increasing caseload. (*Id.* at p. 475.) The court concluded that the state agency violated plaintiffs' rights to compliance with the federal timeliness requirement, and enjoined the commissioner of the state agency "from failing to bring the Virginia Food Stamp program forthwith into compliance with the [Federal] Food Stamp Act [citations.]" (*Id.* at p. 476.) The *Robertson* court declared that "[l]ack of resources and lack of bad faith on the part of the agency officials is no excuse for failing to provide the plaintiffs their statutory entitlements," that "[l]ack of staff or funds is not legally excusable," and that the law "requires *full* compliance absent what is hoped will be minimum human error." (*Robertson, supra,* 766 F.Supp. at p. 476.) Accordingly, the court issued an extraordinarily lengthy order detailing the steps the agency was required to take on matters including providing benefits, tracking compliance with timeline provisions, and monitoring local agencies.

*Dunn, supra,* 474 F.Supp. 269, the most factually apposite of the cases appellants rely upon, was an action for injunctive and declaratory relief claiming the New York Department of Labor's failure to comply with the timeliness requirements of the Social Security Act applicable to first-level appeals from the denial of UI benefits (the same requirements at issue in the instant case) violated the plaintiffs' rights under the due process and equal protection clauses of the United States Constitution, the Social Security Act, and the federal regulations prescribing timeliness standards for first-level appeals. The state agency conceded its performance had dropped below the applicable federal standard (20 C.F.R. § 650.4(b) (2012)), but claimed the plaintiffs' motion for summary judgment should be denied for reasons including that the state provided initial determinations of eligibility for unemployment benefits in a timely manner and it should therefore be deemed to "have fully complied with [its] constitutional and statutory obligations." The state also contended state officials had substantially complied with the timeliness standard relating to first-level appeals "since they have achieved

the 'greatest appeals promptness reasonably attainable in the circumstances . . . .' 41 Fed.Reg. 6757 (1976)." (*Dunn*, at p. 274.) Rejecting these arguments, the court observed that while the last argument "is appealing at first blush, it pales on closer scrutiny. In the first place, [state officials'] explanation for their most recent noncompliance does not explain their failure to comply with Appeals Promptness Standards from January 1972 to March 1977. Additionally, defendants have admitted that the funding problems they experienced have somewhat abated and that they intend to comply . . . in the . . . near future. Finally, while I may sympathize with the state's budgetary problems, it is my job to balance these considerations against the hardships experienced by plaintiffs who may face months without benefits because the State does not act with reasonable promptness. [Citation.] In my view, problems with funding and staffing simply do not outweigh the necessity to promptly determine whether plaintiffs are entitled to unemployment benefits. [Citations.] . . . I am unwilling to find that even given the cutbacks in funding, defendants have done the best they could under the circumstances." (*Dunn*, at p. 275.) The court found the defendants were "thwarting the purpose of the Social Security Act" and entered judgment directing the state agency "to comply with the Appeals Promptness Standards as set forth in 20 C.F.R. § 650.4(b)" and requiring the defendants "to submit to me copies of their monthly Appeals Promptness reports for a period of one year following entry of judgment." (*Id.* at p. 276.)

Although *Dunn* is factually closer to our case than *Robertson* in all other respects, it is easier to distinguish in one important way. Because the defendants in *Dunn* had recently complied with the applicable federal timeliness standard and indicated to the court that they intended to do so in the future, the court inferred that "[t]heir failure to do so presently indicates they are *thwarting* the purpose of the Social Security Act." (*Dunn, supra,* 474 F.Supp. at pp. 275–276, italics added.) There is no such evidence in the present case. Appellants do not claim respondents have the ability to comply with the applicable timeliness standard now or sooner than in six months (the period the proposed order allows for respondents to come into compliance), nor have they made any showing respondents have ignored this responsibility. Respondents' noncompliance appears to have resulted, at least in part, from inadequate funding and staffing, and the periodic furlough of EDD and CUIAB employees mandated by the Governor in the past, which had consequences that are still being felt.

■ This factor is not, however, the chief reason we are unwilling to employ *Dunn* and *Robertson* as a basis upon which to set aside the abstention ruling in this case. Abstention is an equitable doctrine that vests trial judges with a measure of discretion. As we have said, and appellants agree, we review the trial court's decision to abstain for abuse of discretion. (*Alvarado, supra,* 153 Cal.App.4th 1292, 1297.) " ' "Discretion is abused whenever, in

its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. . . . [U]nless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' " (*Blue Cross, supra*, 180 Cal.App.4th at p. 1258.) It must be remembered, however that "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.] If the trial court is mistaken about the scope of its discretion, the mistaken position may be 'reasonable', i.e., one as to which reasonable judges could differ. [Citation.] But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].)

Thus, even if, as is not the case, the facts of *Dunn* and *Robertson* were identical to those here, and the courts in those cases had been asked to abstain and refused to do so, the reasonableness of the adjudications in those cases would not compel us to find unreasonable the decision in this case to abstain; the realm of reason is capacious enough to embrace all of them. Crucially, the grounds upon which the court abstained are fully consistent with the applicable legal principles specified in *Alvarado*.

## II.

Appellants' final argument, which is ill defined, appears to be that mandamus actions are or should be exempt from the abstention doctrine. Pointing out that the judicial power to issue writs of mandamus is expressly granted by the state Constitution (Cal. Const., art. VI, § 10), and California courts have issued writs of mandate to compel state compliance with federal requirements imposed as a result of participation in a federal-state program, such as the UI program,[11] appellants suggest there is no authority "for use of the abstention

---

[11] Like many of the other cases they rely upon, the "similar" cases appellants point to as ones in which California courts issued writs of mandate directing state agencies to comply with federal statutory requirements (*California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559 [115 Cal.Rptr.3d 572]; *California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696 [56 Cal.Rptr.3d 102]; *Conlan v. Bonta* (2002) 102 Cal.App.4th 745 [125 Cal.Rptr.2d 788]) do not involve or even mention the doctrine of judicial abstention, because none presented a situation in which abstention was appropriate, and the state agency defendants never asked the trial court to abstain. In the first two of these cases the appellants were deemed entitled to writ relief because the respondent state agencies improperly set hospital reimbursement rates solely on the basis of budgetary considerations, ignoring their nondiscretionary duty under the Medicaid Act (Aug. 14, 1935, ch. 531, title XIX, as added Pub.L. No. 89-97, tit. I, § 121(a) (July 30, 1965) 79 Stat. 343) to take into account the factors of efficiency, economy, quality of care, and access to care. In the

doctrine to avoid adjudicating issues arising in the context of a writ of mandate." Appellants emphasize that the standards applicable to the issuance of mandamus "further the notions of separation of powers by limiting a court's intervention to those circumstances when an agency has failed to perform a ministerial duty or otherwise abused its discretion. When a trial court abstains from reviewing the actions of an administrative agency—when the basis for a writ is otherwise established—the court is in essence granting that agency unfettered power. Therefore, if the abstention doctrine is applicable at all to mandamus, it should be strictly construed and applied only in those circumstances where one or more of the bases for abstention have been clearly established," which, appellants maintain, is not here the case. There are two problems with this argument.

The first is that, as earlier noted, though mandate is ordinarily classed as a legal remedy it is "largely controlled by equitable principles" (*Wallace v. Board of Education, supra*, 63 Cal.App.2d 611, 617), and appellants concede that our review of the denial of mandate is abuse of discretion,

The second problem is that appellants advance no authority for the proposition that the doctrine of abstention is inapplicable to mandamus actions. Their contention that abstention is incompatible with and undermines the separation of power was an early concern of some federal judges. Chief Justice John Marshall declared, for example, that "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." (*Cohens v. Virginia* (1821) 19 U.S. 264, 404 [5 L.Ed. 257].) The concern of contemporary abstention critics, and the view we understand appellants to be advancing, is that judicial abstention usurps legislative authority by deciding, selectively, whether to enforce a legislative directive. As one commentator explains, "[t]he essential element of any democratic society is at least some level of majoritarian self-determination. In our form of constitutional democracy, we have chosen to vest in a largely unrepresentative judiciary the power to invalidate laws adopted by a majoritarian legislature when those laws are deemed to violate constitutional protections. It has never been suggested, however, that the judiciary may openly ignore a

---

last case, *Conlan v. Bonta, supra*, 102 Cal.App.4th 745, the court found the state could not rely on health care providers to reimburse recipients voluntarily: To do so would violate a provision of the Medicaid Act requiring the states to provide comparable medical services to every participant, in that "if reimbursement by the provider were voluntary, not all program recipients would be treated alike." (*Conlan v. Bonta*, at p. 754.) Unlike the reimbursement requirements of the federal statutes at issue in the three cases appellants rely upon, enforcement of the requirement we are concerned with is administratively facilitated by an elaborate and ongoing remedial process designed to bring noncompliant states into compliance.

legislative judgment on any grounds other than unconstitutionality." (Redish, *Abstention, Separation of Powers, and the Limits of the Judicial Function* (1984) 94 Yale L.J. 71, 76, fns. omitted.) It is argued that if the Legislature intended that the courts exercise a particular jurisdiction, "either to achieve substantive legislative ends or to provide a constitutionally-contemplated jurisdictional advantage, a court may not, absent constitutional objections, repeal those jurisdictional grants. But one may question why, if the courts do not possess the institutional authority to repeal the legislature's jurisdictional scheme, they possess any greater authority to modify the scheme in a manner not contemplated by the legislative body." (*Id.* at p. 77; accord, McMillan, *Abstention—The Judiciary's Self-inflicted Wound* (1978) 56 N.C. L.Rev. 527.) It is also argued that the abstention doctrine not only usurps legislative power but does so without any clear and coherent justification. As legal scholars have noted, in ordering abstention in *Pennzoil Co. v. Texaco Inc.* (1987) 481 U.S. 1 [95 L.Ed.2d 1, 107 S.Ct. 1519], "it took six Justices writing separately, offering varying conceptions of three rather different abstention doctrines, to explain the Court's decision." (Friedman, *A Revisionist Theory of Abstention* (1989) 88 Mich. L.Rev. 530, 531–532.)

Though the arguments against abstention are most frequently aimed at federal judicial abstention, they could be applied as well to the state judicial abstention authorized by *Diaz, Alvarado,* and other California cases. One of the important legislative objectives of the California UI program was "providing prompt administrative adjudication of claims for unemployment benefits" (*Gibson v. Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 496 [108 Cal.Rptr. 1, 509 P.2d 945], citing Unemp. Ins. Code, § 1328), and the Constitution and Legislature vest state courts with jurisdiction and other means to enforce the right to such "prompt" administrative adjudication. By refusing to enforce the right, appellants seem to be saying, the trial court not only abdicated a responsibility conferred on it by the Legislature, but concomitantly assumed an authority (to refrain from enforcing the law) not conferred by any constitutional provision or statute.

Unfortunately for appellants, this criticism—which now comes almost exclusively from the legal academy[12]—has had little effect on federal or

---

[12] See, e.g., Pushaw, *Dual Enforcement of Constitutional Norms: Bridging the Enforcement Gap in Constitutional Law: A Critique of the Supreme Court's Theory That Self-restraint Promotes Federalism* (2005) 46 Wm. & Mary L.Rev. 1289; Estrada, *Pushing Doctrinal Limits: The Trend Toward Applying Younger Abstention to Claims for Monetary Damages and Raising Younger Abstention Sua Sponte on Appeal* (2005) 81 N.Dak. L.Rev. 475; Norris, *The Final Frontier of Younger Abstention: The Judiciary's Abdication of the Federal Court Removal Jurisdiction Statute* (2003) 31 Fla.St.U. L.Rev. 193; Doernberg, *Judicial Refusal to Exercise Congressional Grants of Jurisdiction and Separation of Powers: "You Can Lead a Horse to Water . . .": The Supreme Court's Refusal to Allow the Exercise of Original Jurisdiction Conferred by Congress* (1990) 40 Case W. Res. L.Rev. 997; Mullenix, *A Branch Too Far:*

California courts. Since the opinion more than 75 years ago in *Railroad Comm'n v. Pullman Co., supra*, 312 U.S. 496, which authorized a federal court to delay exercise of jurisdiction to allow a state court to interpret an ambiguous state statute subject to constitutional challenge, the United States Supreme Court has *expanded* use of the doctrine. (See, e.g., *Burford v. Sun Oil Co.* (1943) 319 U.S. 315 [87 L.Ed. 1424, 63 S.Ct. 1098] [ordering abstention in order to prevent federal judicial interference in complex state administrative schemes]; *Younger v. Harris* (1971) 401 U.S. 37 [27 L.Ed.2d 669, 91 S.Ct. 746] [barring federal courts from enjoining an ongoing state criminal proceeding, even to protect federal constitutional rights]; *Samuels v. Mackell* (1971) 401 U.S. 66 [27 L.Ed.2d 688, 91 S.Ct. 764] [applying abstention to the issuance of declaratory relief, not just injunctive relief].)

The seminal California case, because it was the first to address the propriety of abstention directly and in depth, is *Diaz, supra*, 9 Cal.App.3d 588, the reasoning of which was relied upon not just in *Alvarado, supra*, 153 Cal.App.4th 1292, but by our Supreme Court in *Naegele, supra*, 38 Cal.3d at page 523. In sum, whether it be for the better or the worse, judicial abstention now seems as lodged in the jurisprudence of this state as it is in federal jurisprudence. Appellants offer no persuasive reason for us to refuse to apply an otherwise applicable doctrine simply because it arises in a mandamus action.

### III.

As was the case in *Diaz*, appellants "seek the aid of equity because the national government has breached the commitment implied by national . . . policy." (*Diaz, supra*, 9 Cal.App.3d at p. 599.) Like the *Diaz* court, we

---

*Pruning the Abstention Doctrine* (1986) 75 Geo. L.J. 99; but see Birdsong, *Comity and Our Federalism in the Twenty-first Century: The Abstention Doctrines Will Always Be With Us—Get Over It!!* (2003) 36 Creighton L.Rev. 375; Althouse, *Judicial Refusal to Exercise Congressional Grants of Jurisdiction and Separation of Powers: The Humble and the Treasonous: Judge-made Jurisdiction Law* (1990) 40 Case W. Res. L.Rev. 1035; Brown, *When Federalism and Separation of Powers Collide—Rethinking* Younger *Abstention* (1990) 59 Geo.Wash. L.Rev. 114; Vairo, *Making* Younger *Civil: The Consequences of Federal Court Deference to State Court Proceedings* (1989) 58 Fordham L.Rev. 173; Wells, *Why Professor Redish Is Wrong About Abstention* (1985) 19 Ga. L.Rev. 1097.

One of the few criticisms of abstention coming from the Supreme Court after the seminal opinion in *Railroad Comm'n v. Pullman Co.* (1941) 312 U.S. 496 [85 L.Ed. 971, 61 S.Ct. 643], was the lament of Justice Douglas, speaking also for Chief Justice Warren and Justice Brennan, that the delays and expense caused by abstention procedures "dilutes the stature of the Federal District Courts, making them secondary tribunals in the administration of justice under the Federal Constitution." (*Harrison v. N. A. A. C. P.* (1959) 360 U.S. 167, 180 [3 L.Ed.2d 1152, 79 S.Ct. 1025] (dis. opn. of Douglas, J.).)

believe that it is "more orderly, more effectual, [and] less burdensome to the affected interests, that the national government redeem its commitment." (*Ibid.*) Accordingly, the judgment is affirmed.

The parties shall each bear their own costs.

Haerle, J., and Lambden, J., concurred.

A petition for a rehearing was denied February 28, 2013, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 15, 2013, S209858.