Filed 5/4/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOSE ROBLES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>EMPLOYMENT DEVELOPMENT DEPARTMENT,<br><br>     Defendant and Appellant. | A139774<br><br>(Alameda County<br>Super. Ct. No. RG10553752) |

      This controversy—which involves the wrongful denial of unemployment compensation benefits—began in January 2010 because of a pair of shoes. More than five years later, appellant Employment Development Department (EDD or the Department) continues to refuse to award Jose Robles (Robles) the benefits to which he would have been entitled absent the Department's error, this despite being ordered to do so twice by the trial court and once by this court. (See *Robles v. Employment Development Dept.* (2012) 207 Cal.App.4th 1029 (*Robles I*).) Most recently, in response to Robles's motion to enforce writ of administrative mandate, the trial court in August 2013 ordered EDD "to pay withheld federal extension benefits, costs and interest in the amount of $45,560.39, within 30 days." Instead, the Department appeals, arguing that Robles is not entitled to benefits for weeks in which he did not certify that he was able, available, and actively looking for work in accordance with EDD's current regulatory scheme. Thus, EDD asserts, the trial court's order is at odds with both federal and state law. The Department, unfortunately, has shown itself repeatedly unable to see the forest in this matter, instead focusing doggedly on the bureaucratic trees. Having reviewed in

1

some detail EDD's response to the directives of both courts involved in this matter, we see no error in the trial court's order and therefore affirm.

## I. BACKGROUND

We take the following preliminary factual background from our previous decision in *Robles I*, *supra*, 207 Cal.App.4th at pp. 1032-1034:

### A.   *Underlying Facts Pertaining to This Case*

Jose Robles testified without contradiction to the following at the hearing before an administrative law judge (ALJ) of [] California Unemployment Insurance Appeals Board (Board):  He worked as a service technician for Liquid Environmental Solutions for four years until his termination on January 5, 2010.  His job was to collect food grease from restaurants and other food outlets.  His pay was $20.75 an hour.

Robles's supervisor called him on that last day for a meeting and told him he was suspended because of "the incident."  The incident related to Robles's attempt to buy shoes for a friend in need at the Red Wing Shoes store, where company employees buy workshoes for the job every year with a $150 shoe allowance.  Robles asked the clerk if she would measure his friend's foot because he "intended to give it to my friend" who needed shoes.  Robles reasoned that he had a good pair of shoes and his friend needed them more than he did.  The clerk told Robles "that was not possible."

Robles explained that he did not have any "malintention [*sic*] of anything."  He knew the allowance was for him, but he could afford to give it to a friend in need and the company would not be jeopardized because he had other shoes.  His intent was to perform a noble gesture for a friend.  In his view there was a misunderstanding of company policy but no misconduct.  He "attempted to do it and then I was told I cannot do it, . . . let it go."

### B.   *EDD Denial of Benefits*

Robles applied to [EDD] for unemployment benefits.  The EDD's "Record of Claim Status Interview Misconduct" reflects no employer information about the incident; indeed, the EDD investigator did not speak with the employer and indicated a message was left for the employer to call within a certain timeframe, but the employer did not

2

return the call. The document reflects that Robles was terminated for violating a company policy. It relates that Robles attempted to buy safety shoes for a friend at company expense. Robles said he did not get the shoes, and the company did not know the shoes were for a friend. According to the document, Robles was aware of the company policy and that the purchase was for employees only. There were no prior warnings. The record concludes that Robles willfully disregarded his employer's interests.

The EDD's notice of determination states that Robles's claim for unemployment benefits was denied because he "broke a reasonable employer rule." After considering the available information, the EDD concluded Robles did not meet the qualifications for benefits.

C. *Appeals*

Robles appealed the EDD's determination, denying that he broke a reasonable employer rule and stating his employer did not cite any specific rule that was broken and he was not aware of any such rule. Further, Robles protested that he was not provided with the unspecified "available information" mentioned in the EDD's decision, and such information had not been disclosed to him. Finally, Robles attested that he did not obtain an improper benefit or cause any harm to his employer.

Robles was permitted to view the file, for the first time, just prior to the hearing before the ALJ. Over Robles's[1] objection, the ALJ admitted the record of claim from the EDD file. Thereafter, Robles testified as summarized above. Robles also submitted a copy of his handwritten statement which his supervisor requested. Robles explained the following: "I asked the lady to have my friend's foot be measured for I had intended to give to him. He had a recent home accident and needed safety shoes. I honestly believed I can do the noble gesture and not jeopardize my own safety. I had a reserve pair of shoes at home and fully confident I would be wearing one in good condition for another

---

[1] Robles started to explain his objection to the characterization in the investigator's report to the effect that claimant stated he was aware "that the purchase had to be for employees only." The ALJ said he would have a chance later to "tell me more about it."

3

year or more.  [¶]  After understanding the limits of what I can do with my entitlement of annual shoe allowance or privilege, I deeply regret what I attempted to undertake and firmly swear would not do it again."

Nonetheless, the supervisor suspended Robles on January 5, 2010.  He received a final paycheck with no further explanation, effectively terminating him as of that date.

The ALJ found that Robles was discharged for misconduct connected with work. In particular, Robles understood that the employer intended that its employees use the annual shoe allowance to purchase shoes.  Robles breached "a duty of good faith and fair dealing when he attempted to obtain shoes for a friend who was not an employee rather than using the allowance for himself.  [¶]  The claimant may have had good intentions toward his friend, but in his actions he breached a serious obligation he had to the employer."

Robles appealed to a panel of the Board, which reviewed the record and issued a decision adopting as its own the ALJ's issue statement, findings of fact and reasons for decision.  The decision also noted that an employee's misappropriation of employer property is conclusive evidence of misconduct and that here, the claimant was not allowed to use the shoe allowance for his friend because the clerk did not permit the sale.

**D.**    *Mandate Proceeding*

Finally, Robles petitioned for a writ of administrative mandate [(Petition)]. Counsel requested a statement of decision which the court denied.  The trial court denied the [P]etition, concluding that the administrative findings were supported by the weight of the evidence.  [An] appeal followed entry of judgment."

[We end our quotation from *Robles I*.]

**E.**    *Our Decision in Robles I*

On June 22, 2012, we issued our opinion in *Robles I*, holding that Robles's conduct in this case—which evinced at most a good faith error in judgment—was insufficient as a matter of law to support a finding of misconduct within the meaning of section 1256 of the Unemployment Insurance Code (section 1256).  (*Robles I*, *supra*, 207 Cal.App.4th at pp. 1031, 1034-1036.)  Pursuant to that statute, "[a]n individual is

4

disqualified for unemployment compensation benefits if the director finds that he or she . . . has been discharged for misconduct connected with his or her most recent work." (Unemp. Ins. Code, § 1256.)[2]  After reviewing relevant precedent, we concluded that employee behavior constitutes misconduct for purposes of section 1256 only if it somehow demonstrates culpability or bad faith—i.e., a willful or wanton disregard of an employer's interests.  (*Robles I*, *supra*, 207 Cal.App.4th at pp. 1034-1035.)  Here, in contrast:  "Robles knew that the employer intended its employees to use the shoe allowance to purchase safety shoes for work, but the element of culpable intent has not been established.  First, Robles did not try to hide anything when he went to the shoestore.  Next, it is undisputed that he wanted to help his friend who had a recent home accident.  Further, Robles had decent safety shoes and did not feel he would jeopardize the safety purpose of the allowance or otherwise injure his employer's interests.  When his supervisor indicated the employer did not approve of the intended use, Robles registered his regret and assured the supervisor he would comply.  And finally, Robles did not use the shoe allowance for his friend.  At most Robles was guilty of a good faith error in judgment.  At the least Robles misunderstood the limits of what he could do with the safety shoe allowance, which he was entitled to as a benefit of employment."  (*Id.* at p. 1036.)  Thus, his behavior did not qualify as misconduct for purposes of section 1256. (*Id.* at p. 1031.)

Moreover, we noted that section 1256 provides that "[a]n individual is presumed to have been discharged for reasons *other than* misconduct in connection with his or her work . . . unless his or her employer has given written notice to the contrary to the [Department] . . . , setting forth facts sufficient to overcome the presumption" (italics added).  In this case, no evidence was submitted by Robles's employer to rebut the statutory presumption.  Thus, the Department's finding of misconduct was erroneous on this additional ground as well.  (*Robles I*, *supra*, 207 Cal.App.4th at p. 1036.)  Because misconduct under section 1256 could not be established, we concluded that Robles had

---

[2] All statutory references are to the Unemployment Insurance Code unless otherwise specified.

been improperly disqualified from receiving unemployment insurance benefits. We therefore reversed the trial court's judgment and directed it to issue a writ of mandate ordering EDD and the Board "to award Robles the unemployment insurance benefits withheld plus interest on those benefits under Civil Code section 3287, subdivision (a)." (*Ibid*.)

Shortly after we issued our unpublished opinion, we received several requests for publication, including one from Robles's attorney, Gary S. Garfinkle (Garfinkle) and one from the Legal Aid Society-Employment Law Center (Legal Aid).[3] As EDD admits, Garfinkle's request for publication referenced a July 1, 2012, newspaper article from the San Francisco Chronicle which discussed our decision. Further, the article was reprinted in full as an exhibit to Legal Aid's publication request. Among other things, the article indicates that Robles ran out of money after losing his job and "has returned to the Philippines, where he lives with his 95-year-old father." On July 16, 2012, we issued an order granting publication of *Robles I*.

**F.    *Further Proceedings in the Trial Court and Before the Board***

After our remittitur issued, the trial court, on September 25, 2012, vacated its previous order and judgment denying Robles's Petition and issued a peremptory writ of administrative mandamus (Writ) and related order granting the writ (Order). In accordance with our decision in *Robles I*, the Writ commanded both EDD and the Board to: (1) set aside their previous administrative decisions with respect to Robles's claim for unemployment insurance benefits; (2) comply with the standards set forth in *Robles I* "for determining whether 'misconduct' within the meaning of Unemployment Insurance Code section 1256 has occurred which warrants denial of the fundamental vested right to unemployment insurance benefits;" (3) award to Robles "the unemployment insurance benefits that were withheld beginning January 5, 2010 and including extensions under state and federal law, plus interest on those benefits under Civil Code section 3287, subdivision (a)"; and (4) file a return before November 15, 2012, stating what they had

---

[3] On our own motion, we take judicial notice of this court's record in *Robles I*. (Evid. Code, §§ 452, subd. (d) & 459.)

done to comply with the Writ. Moreover, in its related Order, the trial court expressly retained jurisdiction "to fully resolve this matter, including but not limited to review of [EDD and the Board's] award of benefits and interest and return to the writ; enforcement of the writ; and consideration of [Robles's] applications for attorney fees and other costs." The Writ and the Order—which were drafted by Garfinkle—were approved by Deputy Attorney General Cheryl Feiner (DAG Feiner) on behalf of EDD and the Board prior to their uncontested issuance by the trial court.

Several days later, the Board issued a new decision, setting aside its prior determination in accordance with the terms of the Writ. Specifically, the Board concluded that "[t]he claimant is not disqualified from receiving unemployment insurance benefits under section 1256 of the Unemployment Insurance Code. Unemployment insurance benefits that were withheld are payable, plus interest on those benefits pursuant to California Civil Code section 3287."

G.      *EDD's Efforts to Comply with the Writ of Mandate*

While our remittitur was pending, Garfinkle had contacted DAG Feiner to discuss how to handle payment of the unemployment benefits owed to Robles. Specifically, Garfinkle inquired: "So we may proceed expeditiously on remand, please advise what the full amount of unemployment benefits are that would have been available to a person who was terminated January 5, 2010. Please include all extensions of unemployment benefits by acts of Congress or the Legislature." DAG Feiner responded that "[t]his is not how the reimbursement process will be handled." Rather, she stated: "Upon issuance of the Board's amended decision, EDD will calculate the benefits due and proceed with payment. At this point, neither my client or I can provide you with a response as to the full amount of unemployment benefits since that is through EDD . . . you will have to work directly with EDD, as EDD is the entity responsible for those calculations."

Thereafter, Garfinkle requested the benefit information from EDD staff attorney Glenn Jones (Jones), the agency contact provided to him by DAG Feiner. According to Garfinkle, Jones initially "appeared to indicate that he would arrange for the calculations." However, Garfinkle received nothing and—after a second follow up on

7

September 19, 2012, in which Garfinkle indicated that the remittitur had issued and requested the status of the benefit information—Jones suggested that Garfinkle contact DAG Feiner "since she represents EDD and [the Board] in this matter."

Garfinkle immediately informed DAG Feiner that Jones had referred him back to her, and again requested the unemployment benefit calculations for Robles. DAG Feiner responded the next day, September 20, as follows: "[A]fter discussion with both EDD and [Board] staff counsel, you are not entitled to the calculations until they have been completed in the course of *standard processing*. EDD cannot calculate the amount owed to your client until the Superior Court remands it back to [the Board], and then it is forwarded to EDD" (italics added). As described above, the trial court executed its Writ and Order a few days later on September 25, 2012. And, the Board almost immediately issued its new decision on September 27, indicating that the "[u]nemployment insurance benefits that were withheld are payable, plus interest . . . ."

At this point, DAG Feiner could easily have contacted Garfinkle to work out a process for expeditiously obtaining any information EDD still needed in order to promptly pay the benefits that the Department had erroneously withheld from Robles for over two years. (See *Los Angeles Unified School Dist. v. Livingston* (1981) 125 Cal.App.3d 942, 947 (*Livingston*) [noting that the " 'very essence' " of the unemployment compensation insurance program " 'is its provision for the prompt payment of benefits to the unemployed' " and that " '[a]ny substantial delay would defeat this purpose and would bring back the very evil sought to be avoided' "], quoting *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 298.) However, she failed to do so. Instead, this is what happened.

Despite EDD's counsel arguably having actual notice that Robles no longer lived there—through the newspaper article described above that was attached to court documents and which indicated that, after running out of money, Robles had relocated to the Philippines to live with his father—EDD sent a form notice to Robles at the address he had provided to the agency while his case was pending before the Board over two years earlier. This notice, dated October 5, 2012, stated that an EDD debit card was

8

being separately mailed to Robles within five business days so that he could access his "first electronic benefit payment." The notice further stated: "You will continue to certify for your benefits in the same manner as you have been doing." The address on file with EDD happened to be that of Robles's brother, where Robles had lived temporarily after he became unable to afford his own housing. Thus, Robles received the October 5 notice from his brother in late October. The referenced debit card never arrived, however, so Robles contacted EDD, and they forwarded the card to him on November 2, 2012. Through this process, Robles received a payment of $12,240 from EDD.

Also in late October, Robles received through his brother an additional notice from EDD dated October 11, 2012. This notice—denominated "Notice of Determination for Emergency Unemployment Compensation (EUC)"—indicated that Robles had qualified for the first federal extension of his unemployment benefits related to his January 2010 claim. The notice went on to state: "**You will be mailed claim forms which you will have to return to EDD if you would like to collect these benefits. In order to receive UI benefits on your first federal extension you must continue to meet all UI eligibility requirements each week.** [¶] Benefits are payable only if you qualify each week and you are able and available to accept work." The notice further specified that Robles was entitled to a maximum of $9000 under the first-tier extension (20 weeks at $450 per week), but also stated that the last date that any first-, second-, third- or fourth-tier extension could begin was December 23, 2012, and that the last date benefits could potentially be payable was December 29, 2012, less than three months from the date of the notice. In short, the October 11 notice was internally inconsistent and confusing. Although it referenced his January 2010 claim, it seemed to indicate that Robles would be required to provide current certifications of his eligibility and that he had an impossibly short timeframe in which to do so.

The October 11 notice also set forth a series of "new" work search and reemployment eligibility assessment (REA) requirements that must be met in order to

9

obtain federal extension benefits.[4]  Specifically, with respect to work search efforts, a claimant was required to:  (1) register for work by completing or updating a resume on EDD's CALJOBS Web site; (2) continue to look for work each week as instructed by EDD; (3) contact at least three employers each week; and (4) maintain a detailed report of these work search contacts, including date applied, company name, company address, person contacted, type of work sought, and the result of the contact.  With respect to the new REA requirements, the October 11 notice stated that any REA appointment scheduled by EDD is mandatory and that failure to participate "may result in delay and potential denial" of benefits.  The notice finally declared that the "decision" it detailed was final unless appealed within 20 days from the date of the notice.

Robles contacted Garfinkle on October 30, 2012, asking for advice regarding the two notices.  The next day, Garfinkle emailed copies of the October 5 and October 11 notices to DAG Feiner, stating:  "I learned yesterday that EDD sent the attached notices to Mr. Robles.  Please remind your client that I am the attorney of record and should receive copies of all communications regarding this matter.  [¶]  Please explain the purpose and intent of the attached notices.  They appear to treat Mr. Robles as if he must establish continued eligibility on a weekly basis.  Please advise whether this is indeed the intent.  More to the point, please advise how these notices comply with the mandate 'to award to Jose Robles the unemployment insurance benefits that were withheld beginning January 5, 2010 and including extensions under state or federal law, plus interest on those benefits under Civil Code section 3287, subdivision (a).[']"  DAG Feiner did not reply.  After the trial court's mandated November 15, 2012, deadline for filing a return to the Writ had passed, Garfinkle contacted her again, asking about the status of the return and requesting a response to his October 31 email.  DAG Feiner replied that she had forwarded his requests to her client and that the return would be filed soon.

Garfinkle finally received a substantive response from DAG Feiner on December 4, 2012.  First, despite the fact that Garfinkle represented Robles before the

_____

[4] As discussed in detail below, these new obligations were adopted in response to federal legislation enacted in 2012.  (See section II(B), *post*.)

Board and throughout the related judicial proceedings, DAG Feiner explained: "The reason that you were not sent any notification is because the certifications, eligibility decisions, and all official correspondence for Mr. Robles are *system generated* and sent to the mailing address on record for Mr. Robles. There is *no process* for forms to be sent directly to you. However, if Mr. Robles designates in writing that you are his authorized representative, the EDD can communicate directly with you to respond to questions and provide information. The written designation is good for 30 days at a time" (italics added). With respect to the award of benefits to Robles, DAG Feiner stated that Robles had been paid unemployment benefits at a weekly rate of $450 for the 26 weeks of his regular unemployment claim and for one week of his first-tier federal extension. These payments were made because Robles had been submitting timely certifications while his appeal was pending before the Board that he was able, available, and actively looking for work.

According to DAG Feiner, certification forms were mailed to Robles for the remaining 19 weeks of his first-tier federal extension on October 11, 2012, and he was required to return those forms within 14 days. Since Robles never returned them (a fact which she found "surprising"), his federal extension claim was deactivated. DAG Feiner further explained: "If he submits these forms now they will be considered untimely and he will be scheduled for an eligibility interview to determine if he had good cause for not returning them within the required 14 days. If the Department disqualifies payment for the affected 19 weeks, Mr. Robles will need to file another appeal and have the decision reversed in order to receive payment." No mention was made regarding benefits under any additional federal extensions or stimulus augmentations. Rather, DAG Feiner indicated that if Robles "is still unemployed and wants to start claiming benefits for current weeks he should contact EDD . . . ."

On December 7, 2012 (over three weeks late), EDD and the Board filed a return with the trial court, essentially stating that they had complied with the Writ based on the sequence of events outlined by DAG Feiner in her December 4 email to Garfinkle. Specifically, they asserted that state and federal law require claimants to "prove

11

continued, timely, weekly eligibility for benefits" and that Robles had received "all of the unemployment benefits for which he certified he was eligible." On this basis, they argued that they had fully complied with the Writ.

According to Robles, however, neither he, his brother, nor Garfinkle had ever received the certification forms that EDD claimed to have mailed to him in October 2012 and thus they were unaware of the 14-day deadline. Moreover, Garfinkle's repeated attempts to obtain copies of all of EDD's post-appeal communications with Robles went unanswered. In addition, Garfinkle's efforts to obtain an explanation as to why EDD had failed to pay federal stimulus augmentations, interest, and costs with respect to Robles's case were equally unsuccessful.

## H. *Robles's Motion to Enforce Writ of Administrative Mandate*

Given these circumstances, Robles moved to enforce the trial court's Writ on May 3, 2013. Robles claimed that not only had EDD and the Board failed to comply with the mandate of the trial court to "award" the "benefits that were withheld beginning January 5, 2010," they had also violated his due process rights by refusing to cooperate with his attorney, sending complex and internally inconsistent notices to his former address, and paying him only a fraction of the benefits to which he was entitled. He sought an order from the trial court "designed to ensure full compliance without further undue delay and hardship to Robles."

In connection with this enforcement motion, Robles submitted several declarations which set forth his continued unemployment and job search efforts as follows: "I have been unemployed since January 5, 2010, due to the termination that is the subject of this case. I diligently attempted to obtain employment, but was unsuccessful. My inability to obtain employment appears to be due to the record of having been fired, my advanced age, and the harsh economy."[5] He further stated: "I am still available to work and desire to work." In addition, Robles declared that, after the Board denied his appeal, he had no further contact with EDD until it sent the two October notices described above to his

---

[5] Robles was 64 years old in July 2012 when we issued our published opinion in *Robles I*.

former address. Specifically, after the Board's decision, Robles no longer received any certification forms from EDD or the Board on which to certify that he remained unemployed despite his diligent search for work. Thus, Robles explained: "Although I diligently attempted to find work, I stopped keeping records of my efforts after [EDD and the Board] informed me that they terminated the certification process in 2010. I no longer recall specific details of those efforts."

Robles additionally submitted information regarding the amount of unemployment benefits that would have been available to a person who was terminated on January 5, 2010. According to Garfinkle, because EDD and the Board refused to provide him with the relevant calculations, he "consulted specialists in unemployment insurance matters who provided documents found on EDD's website and other online sources which show that applicants in 2010 were eligible to receive 26 weeks of 'regular' unemployment benefits plus 73 weeks under five federal extensions (a total of 99 weeks), with $25 per week in federal stimulus augmentations added through December 11, 2010." Detailed calculations—including state and federal benefits, court costs, interest, and a credit for benefits previously paid—were attached to Robles's motion and indicated that the total due to Robles as of June 1, 2013, was $45,560.39.

Based on the situation outlined in his motion, Robles requested an order from the trial court requiring EDD and the Board to: (1) pay the withheld benefits, interest, and costs in accordance with Robles's calculations as set forth in the motion; (2) communicate directly with Garfinkle in all matters involving compliance with the Writ or any enforcement order; (3) make all payments under the Writ or any enforcement order to Garfinkle's attorney-client trust account; (4) revise their regulations and internal guidelines, or otherwise demonstrate efforts made to ensure future compliance with the standards articulated by *Robles I*; and (5) pay fines of $1000 each pursuant to Code of

13

Civil Procedure section 1097 based on their "extraordinary disobedience" with the terms of the Writ.[6]

In response, EDD and the Board defended their compliance with the Writ, reiterating that Robles was not eligible for benefits for weeks when he did not complete "the necessary paperwork to certify that he was available for work but remained unemployed despite diligently searching for work." Although they conceded that Robles was entitled to receive interest on the 27 weeks of benefits that were paid as well as his costs on appeal, EDD and the Board blamed their lack of compliance with these Writ requirements on Robles's failure to update his address of record with EDD. EDD never attempted to defend its chosen process for effecting the "award" of "benefits that were withheld beginning January 5, 2010"; nor did it contest the specifics of Robles's benefit calculations as set forth in the motion. Rather, as made clear in a declaration submitted by Deputy Attorney General Charles Antonen in opposition to Robles's enforcement motion, EDD continued to maintain that in order for Robles's to receive any further benefits he would either need to file certifications attesting to current work search efforts or file certifications backdated to 2010 and participate in a determination interview (and possibly a further appeal process) to explain his "failure to timely return the original claim forms mailed in October 2012."

In reply, Robles reported that EDD had been unable to provide copies of the certification forms purportedly mailed to him in October 2012. In addition, EDD represented that it was unaware of any accompanying cover letter or notice. EDD blamed its automated process for initially being unable to provide even a sample of the

---

[6] Section 1097 of the Code of Civil Procedure provides: "When a peremptory mandate has been issued and directed to any inferior tribunal, corporation, board, or person, if it appear to the Court that any member of such tribunal, corporation, or board, or such person upon whom the writ has been personally served, has, without just excuse, refused or neglected to obey the same, the Court may, upon motion, impose a fine not exceeding one thousand dollars. In case of persistence in a refusal of obedience, the Court may order the party to be imprisoned until the writ is obeyed, and may make any orders necessary and proper for the complete enforcement of the writ."

14

certification forms sent to Robles. Eventually, EDD did provide a sample certification form which did not indicate any deadline for return.

At the July 18, 2013, hearing on Robles's motion to enforce the Writ, the trial court agreed to limit any enforcement order and fine to EDD, as the Board had fully complied with its duties under the Writ. The trial court further stated its intention to grant Robles's motion, but agreed to allow supplemental briefing on "the issue of the federal extensions and the paperwork." In addition, indicating that there would be "an order with a monetary amount," the trial court instructed the parties to submit briefing showing "what you each think the calculation of the benefits are."[7]

On August 15, 2013, the trial court issued its order granting Robles's motion to enforce the Writ (Enforcement Order). The trial court indicated that it was "not persuaded" that this Court merely found Robles eligible for benefits in *Robles I*, such that his receipt of benefits could be "conditioned upon meeting the current eligibility requirements." In addition, it concluded that requiring Robles "to retroactively certify he satisfied 'work search requirements' during the time he was being denied such benefits, violates due process." Thus, the court ordered EDD to "pay withheld federal extension benefits, costs and interest in the amount of $45,560.39, within 30 days of service of this order." The court based the amount on the calculations supplied by Robles after "EDD failed to provide a calculation of benefits as requested." In doing so, the court noted that EDD had provided no evidence contesting those calculations. It found EDD's assertion that it could not determine the amount owed without completion of the certification forms "not a convincing argument."

The trial court further provided that EDD communicate directly with Garfinkle regarding all matters involving the Writ and the Enforcement Order, and that any monies disbursed by EDD pursuant to the Writ or the Enforcement Order be paid into Garfinkle's

---

[7] With respect to the specific calculations, DAG Feiner indicated: "We're not even disputing the calculation, because we can't tell what the calculation's going to be, because it's done in this, like, off-site, far far away." She further argued that, without the necessary claim forms, it is "impossible" to calculate what Robles is owed.

15

attorney-client trust account.  Finally, finding EDD's failure to pay interest to Robles as commanded by the Writ to be "without just excuse," the trial court ordered EDD to pay a $1000 fine pursuant to section 1097 of the Code of Civil Procedure.  Judgment was entered on September 20, 2013, and timely notice of appeal by EDD brought the matter before this court for a second time.

## II.  DISCUSSION

**A.** *Statutory Background and Standard of Review*

"The fundamental purpose of California's Unemployment Insurance Code is to reduce the hardship of unemployment." (*Paratransit, Inc. v. Unemployment Ins. Appeals Bd.* (2014) 59 Cal.4th 551, 558; see § 100 [unemployment insurance system created to provide benefits "for persons unemployed through no fault of their own" and to reduce "the suffering caused thereby"].)  Specifically, " '[u]nemployment benefits provide cash to a newly unemployed worker "at a time when otherwise he would have nothing to spend," serving to maintain the recipient at subsistence levels without the necessity of his turning to welfare or private charity.' " (*Gilles v. Dept. of Human Res. Dev.* (1974) 11 Cal.3d 313, 325 (*Gilles*), quoting *California Dept. of Human Res. Dev. v. Java* (1971) 402 U.S. 121 at pp. 131-132.)  Thus, as stated above, the prompt payment of benefits is the " 'very essence' " of the unemployment compensation insurance program. (*Livingston*, *supra*, 125 Cal.App.3d at p. 947.)  And, on appeal, we liberally construe the Unemployment Insurance Code to advance the legislative objective of reducing the hardship of unemployment.  (*Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584 (*Sanchez*).)

In the present case, EDD and the Board chose to attempt to comply with the trial Court's September 2012 Writ, which ordered payment of withheld unemployment benefits to Robles.  They therefore waived their right to appeal from the Writ's directives, and the validity of the Writ is not before us.  (*Los Angeles Internat. Charter High School v. Los Angeles Unified School Dist.* (2012) 209 Cal.App.4th 1348, 1354-1355 (*LAICHS*); *City of Carmel-by-the-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 970 (*Carmel-by-the-Sea*).)  Rather, in these proceedings, we review the trial court's

16

Enforcement Order entered pursuant to section 1097 of the Code of Civil Procedure. That statute provides that if a writ is issued and persistently disobeyed, the court "may make any orders necessary and proper for the complete enforcement of the writ." (Code Civ. Proc., § 1097; see *Carmel-by-the-Sea*, *supra*, 137 Cal.App.3d at p. 971.) Under such circumstances, at issue is whether the trial court erred either in concluding that EDD had failed to comply with the Writ or in fashioning the specifics of its Enforcement Order. Thus, our focus is on EDD's response to the Writ and the trial court's assessment of that response. (*LAICHS*, *supra*, 209 Cal.App.4th at p. 1355.) Throughout this analysis, we will, of course, consider issues of statutory interpretation de novo. (*Norasingh v. Lightbourne* (2014) 229 Cal.App.4th 740, 753.)

**B.    *Compliance with Federal Law***

We address first EDD's assertion that the trial court's enforcement order is in "direct violation" of federal law. In support of this contention, EDD cites the federal requirement that state unemployment laws must include a provision that "as a condition of eligibility for *regular compensation* for any week, a claimant [for unemployment benefits] must be able to work, available to work, and actively seeking work" (italics added).[8] (42 U.S.C. § 503(a)(12) (section 503(a)(12)).) Since, generally speaking, the "terms and conditions of the State law which apply to claims for regular compensation and to the payment thereof shall apply to claims for emergency unemployment compensation and the payment thereof," a claimant for federal extension benefits (sometimes referred to as emergency unemployment compensation or EUC) must meet

---

[8] For purposes of this federal statute, "actively seeking work" is defined to mean that the individual at issue: "(A) is registered for employment services in such a manner and to such extent as prescribed by the State agency; [¶] (B) has engaged in an active search for employment that is appropriate in light of the employment available in the labor market, the individual's skills and capabilities, and includes a number of employer contacts that is consistent with the standards communicated to the individual by the State; [¶] (C) has maintained a record of such work search, including employers contacted, method of contact, and date contacted; and [¶] (D) when requested, has provided such work search record to the State agency." (Pub.L. No. 112-96 (Feb. 22, 2012), § 2141(b), 126 Stat. 168.)

17

the same work search requirements as a claimant for regular compensation. (Pub.L. No. 110-252 (June 30, 2008), § 4001(d)(2) , 122 Stat. 2354.)

EDD argues that by exempting Robles from any further continuing certification requirements regarding his work search efforts, the trial court violated federal law and put "EDD's unemployment compensation program in potential jeopardy." Specifically, the Department contends that its failure to comply with federal law in this instance—by paying benefits without the necessary certifications—could lead the federal government to stop making payments to the state under its unemployment compensation program. We are not persuaded.

First, we believe that the only reasonable interpretation of this court's mandate in *Robles I* to "award Robles the unemployment insurance benefits withheld" is that Robles must receive the benefits to which he would have been entitled had the Department properly found him eligible for unemployment compensation in 2010. (*Robles I*, *supra*, 207 Cal.App.4th at p. 1036.) The trial court's subsequent Writ commanding EDD and the Board to award to Robles "the unemployment insurance benefits that were withheld beginning January 5, 2010 and including extensions under state or federal law" is in accord with our *Robles I* holding and must be similarly construed. However, as Robles correctly points out, the federal work search requirements set forth in section 503(a)(12) were adopted in 2012 and have been expressly held to apply only "to weeks beginning after the end of the first session of the State [L]egislature which begins after the date of enactment" [of Public Law 112-96 on February 22, 2012]. (Pub.L. No. 112-96 (Feb. 22, 2012), § 2101(b), 126 Stat. 159.) Thus, by their express terms, these federal requirements are inapplicable to the benefits that—absent EDD error—should have been paid to Robles by the Department in 2010 and 2011.

Moreover, although California's unemployment insurance program is part of a national system established under federal law, the federal government has given the states "considerable liberality" in defining the specifics of their own benefit structures. (*Aguilar v. Unemployment Ins. Appeals Bd.* (1990) 223 Cal.App.3d 239, 245 (*Aguilar*); *Acosta v. Brown* (2013) 213 Cal.App.4th 234, 238 (*Acosta*); see *American Federation of*

18

*Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1024 (*AFL*) [noting that the federal unemployment plan " ' "contemplates that the States shall have broad freedom to set up the type of unemployment compensation they wish" ' "].)  In fact, prior to the adoption of the 2012 legislation referenced above, the federal government made clear that state law provisions with respect to work search and availability governed claims for federal extension benefits.  (U.S. Dept. of Labor, Unemp. Ins. Program Letter No. 23-08, Change 1 (Aug. 15, 2008)  Emergency Unemployment Compensation 2008, Questions and Answers at p. 8 [all such program letters are hereafter referenced as "UIPL"]; see UIPL 04-10, Change 4 (Aug. 13, 2010) Questions and Answers at p. 1.)[9] Thus, individual compliance with work search requirements was a matter left in the hands of the state for determination in accordance with state law.

Finally, we find specious EDD's argument that it risks being defunded by the federal government should Robles be awarded unemployment benefits by the trial court in this case without properly certifying to his continuing availability and search for work. It is true that the federal statute provides that "a failure to comply substantially with any provision specified in subsection (a) [of section 503]," may result in notification from the Secretary of Labor that "further payments will not be made to the State" until the Secretary of Labor is satisfied that there is "no longer any such . . . failure" to comply. (42 U.S.C. § 503(b)(2).)  However, we doubt the trial court's enforcement order would be construed as a failure to substantially comply with section 503(a)(12), even assuming the provision was applicable to this case.  Indeed, the Department of Labor has declined to pursue defunding in the face of much more egregious and systemic noncompliance by EDD with federal law in the processing of unemployment benefit claims, viewing such a sanction as inimical to the beneficiaries of the state's unemployment compensation program.  (See *Acosta*, *supra*, 213 Cal.App.4th at p. 242.)

---

[9] The UIPL's referenced above are before this court as part of EDD's request for judicial notice dated March 14, 2014.  We hereby grant EDD's judicial notice request, and— having reviewed these voluminous materials—conclude that they support our analysis. (Evid. Code, §§ 452, subd. (c) & 459.)

At most, EDD may be concerned that failure to comply with the specific certification requirements of its state-mandated process may negatively impact its ability to successfully seek reimbursement from the federal government for some or all of the federal extension benefits payable to Robles pursuant to the terms of the Writ and the Enforcement Order. However, EDD's obligation to pay Robles the liquidated sum set forth in the Enforcement Order is not contingent on the success of any reimbursement efforts. Moreover, it is hard to see how the court-mandated payment of what is, in essence, a damages award would somehow constitute a violation of federal law, whether or not reimbursement is available. (See *Aguilar*, *supra*, 223 Cal.App.3d at pp. 243-246 [actions to recover wrongfully withheld benefits such as unemployment insurance benefits constitute actions for damages].) Instead, if no reimbursement from the unemployment benefits fund is possible, the award would appear to be a cost of EDD's administration of its unemployment benefit system. (Cf. *AFL*, *supra*, 13 Cal.4th at pp. 1026, 1033 [citing UIPL No. 11-92 (Dec. 30, 1991) for proposition that because interest is not paid as part of unemployment benefits, but only to compensate for the delay in payment of compensation, it may not be paid from the state unemployment fund, but must be paid as a separate administrative expense].)

In sum, we see nothing in federal law that would preclude the trial court's issuance of its Enforcement Order in this case. Indeed, with respect to federal law compliance, EDD might more usefully focus on 42 United States Code section 503(a)(1). That federal statute mandates that a state's *method of administering its unemployment insurance program* must reasonably insure full payment of unemployment compensation "when due," language which has been construed to mean that compensation payments "are required at the earliest administratively feasible stage of unemployment." (42 U.S.C. § 503(a)(1); *AFL*, *supra*, 13 Cal.4th at p. 1026.)

C.      *Appropriateness of Enforcement Order under State Law*

Citing section 1253 and related regulations, however, EDD also avers that the trial court's Enforcement Order runs afoul of state law. Section 1253 provides that "[a]n unemployed individual is eligible to receive unemployment compensation benefits *with*

20

*respect to any week* only if the director finds" that the individual has met a number of specified continuing eligibility requirements. (§ 1253, subds. (a)-(f), italics added.) As is relevant here, subdivision (c) of section 1253 requires that a claimant be "able to work and available for work for that week." In addition, pursuant to subdivision (e) of section 1253, a claimant must have conducted "a search for suitable work in accordance with specific and reasonable instructions of a public employment office." Finally, subdivision (a) of section 1253 provides that a "claim for benefits with respect to that week" must have been made "in accordance with authorized regulations." (See § 1326 ["[c]laims for unemployment compensation benefits shall be made in accordance with authorized regulations of the director"].)

As is relevant here, EDD regulations applicable to continuing claims for benefits state that, for each week, a claimant must certify the following with respect to availability and search for work: (1) "[t]hat he or she was unemployed . . . "; (2) "[w]hether he or she was physically able to work full time each of the seven days of the week"; (3) "[w]hether there was any other reason he or she could not have worked full-time each workday"; (4) "[w]hether he or she did try to find work"; (5) "[i]f requested by the [Department], the date applied for work, the company name and address, the person contacted, the type of work applied for, and the results of the contact"; and (6) "[w]hether he or she refused any work." (Cal. Code Regs., tit. 22, § 1326-6(b).) The regulations do not expressly require that this certification be made on the Department's system-generated forms. (See generally Cal. Code Regs., tit. 22, §§ 1326-1 through 1326-12.)

Moreover, pursuant to EDD regulation, "[t]he claimant shall, to maintain his or her eligibility to file continued claims during a continuous period of unemployment, file continued claims at intervals of not more than two weeks, or such other interval as the [Department] shall require, unless he or she shows good cause for his or her delay in filing his or her continued claim." (Cal. Code Regs., tit. 22, § 1326-6(c).) "Good cause" is nonexclusively defined in the regulations to include things such as (1) reasonable reliance on erroneous advice given by the Department; (2) excusable neglect; (3) failure by the Department to promptly discharge its responsibilities; and (4) "[c]ompelling

21

reasons" which would prevent a reasonable person from filing the claim, such as illness, natural disaster, lack of transportation, or "compelling personal affairs . . . such as an appearance in court." (Cal. Code Regs., tit. 22, § 1326-10; see Cal. Code Regs., tit. 22, § 1326-6(e).) Interpreting an unrelated reference to "good cause" in connection with eligibility for unemployment compensation benefits, our Supreme Court has defined "good cause" as "an adequate cause, a cause that comports with the purposes of the Unemployment Insurance Code and with other laws." (*Sanchez*, *supra*, 36 Cal.3d at p. 584.)

EDD argues strenuously that the trial court improperly found Robles eligible for continuing benefits without requiring him to complete the weekly certification forms mandated by section 1253 and EDD regulations. It is undisputed that—at the time the trial court was considering EDD's response to the Writ's command that EDD award Robles "the unemployment insurance benefits that were withheld"—Robles had not completed the Department's standard continued claim certification forms for all but one week of the federal extension benefits that would otherwise have been available to him in 2010 and 2011. On the other hand, EDD consistently maintained (and continues to assert on appeal) that it stood ready and willing to pay unemployment benefits to Robles for the weeks that he was eligible upon completion of the required continued claim certifications. Indeed, EDD contends that it was willing to accept the requisite claim forms even though, in its estimation, the deadline to submit them has expired.

The trial court also had before it undisputed evidence that Robles met the substantive eligibility requirements for receipt of unemployment benefits throughout 2010 and 2011 because he was unemployed during that time and yet was able, available, and actively seeking work. Specifically, as stated above, Robles submitted declarations in the trial court stating: "I have been unemployed since January 5, 2010, due to the termination that is the subject of this case. I diligently attempted to obtain employment but was unsuccessful. My inability to obtain employment appears to be due to the record of having been fired, my advanced age, and the harsh economy." He further stated: "I still am available to work and desire to work." Finally, he reported that, "[a]lthough I

22

diligently attempted to find work, I stopped keeping records of my effort after [EDD and the Board] informed me that they terminated the certification process in 2010. I no longer recall specific details of those efforts." In addition, the trial court had evidence before it, also uncontested, regarding the amount of unemployment benefits that would have been available to a person, like Robles, who was terminated on January 5, 2010.

Finally, the record before the trial court revealed an alarming failure by EDD in the wake of the Writ to promptly award Robles the benefits to which he was entitled due to a complete breakdown in their "standard processing" when applied to the unique circumstances of his case. First, EDD refused to work with Robles's attorney to effect the prompt payment of benefits to Robles, despite Garfinkle's repeated attempts to gain the Department's cooperation. In fact, EDD refused to even communicate with Garfinkle absent a cumbersome designation process that was required to be repeated every 30 days. Next, although EDD's attorney arguably had actual notice—based on the newspaper article described above—that Robles had relocated to the Philippines after running out of money, the Department sent certification forms with an extremely short 14-day deadline for completion to a two-year-old address of record that Robles had used before EDD terminated his previous certification process in July 2010. Moreover, although EDD could never produce a copy of the certification forms it allegedly sent to Robles, the notices that Robles did receive describing the certification forms were internally inconsistent and confusing. Specifically, they were unclear as to whether Robles would be required to provide current certifications or certifications covering his work search efforts in 2010 and 2011. In addition, the notices seemed to indicate that Robles would be required to comply with "new" work search requirements based on the 2012 federal legislation described above, despite the fact that these new requirements were not applicable to claims made in 2010 and 2011.[10]

---

[10] As stated above, the trial court in this case determined that requiring Robles "to retroactively certify he satisfied 'work search requirements' during the time he was being denied such benefits, violates due process." EDD disputes this conclusion. We note, however, that EDD's opening brief on appeal contains not a single citation to any

Under such circumstances, we have no difficulty determining that there was a persistent failure on EDD's part to obey the commands of the Writ and that the trial court's Enforcement Order was "necessary and proper" to effect that enforcement. (Code Civ. Proc., § 1097.) EDD's chosen process in response to the Writ had utterly failed to result in the timely payment of all of the benefits to which Robles was entitled. Further, Robles had shown himself substantively eligible for the identified benefits by attesting to his availability, and diligent search, for work. Indeed, assuming good cause excused Robles's failure to return the certification forms EDD asserts it mailed to him in October 2012 and also allowed for the aggregating of the usual bi-weekly claims, the declarations submitted by Robles in the trial court arguably fully complied with the certification requirements mandated by state law and EDD regulation. (See § 1253; Cal. Code Regs., tit. 22, §§ 1326-6, 1326-10.) Whether they did or not, however, we believe that, under the circumstances presented to it, the trial court had the authority to order the immediate payment of benefits without requiring Robles to jump any additional procedural hurdles. This is especially true where, as here, any procedural requirements must be liberally construed to "further the legislative objective of reducing the hardship of unemployment." (*Sanchez, supra*, 36 Cal.3d at p. 584.)

We are not unsympathetic to the plight of EDD during the timeframe relevant to this appeal, when the worsening economy led to a flood of newly unemployed persons seeking benefits while at the same time contracting the resources available to the Department to process those claims. (See *Acosta, supra*, 213 Cal.App.4th at p. 240-241.) Certainly, automation was one important tool in the Department's arsenal to help it

---

authority in support of its argument that the trial court erred in finding a violation of due process in this case. Instead, EDD simply reiterates that its usual process was available to Robles and that he was not eligible for federal extension benefits without completion of the necessary certifications. Under such circumstances, we could easily consider the argument forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) In any event, we do not reach the due process issue because we conclude that the trial court's Enforcement Order was appropriate under the particular facts of this case whether or not a violation of due process occurred.

handle this large influx of cases. However, automation is not an excuse for incompetence. The Department's repeated error in this matter was its stubborn refusal to acknowledge that the exigencies of Robles's extremely atypical situation could not be adequately addressed through recourse to "standard processing" pursuant to its usual regulatory scheme. As a result, the trial court in this matter was confronted with a situation in which an individual who, though clearly substantively entitled to unemployment benefits under state law, had been denied those benefits for over three years. It has now been over five years since Robles, albeit misguidedly, offered to buy a pair of shoes for a friend. Enough is enough.

### III.  DISPOSITION

The judgment is affirmed, and this matter is remanded to the trial court for implementation of its Enforcement Order. Robles is entitled to his costs on appeal.

_____

REARDON, J.


We concur:


_____

RUVOLO, P.J.


_____

STREETER, J.

Trial Court:                                    Alameda Superior Court


Trial Judge:                                    Hon. Evelio M. Grillo


Counsel for Plaintiff and                       Gary S. Garfinkle
Respondent:                                     Maria J. Garfinkle


Counsel for Defendant and                       Kamala D. Harris
Appellant:                                      Attorney General of California
                                                Julie Weng-Gutierrez
                                                Senior Assistant Attorney General
                                                Susan M. Carson
                                                Supervising Deputy Attorney General
                                                Cheryl L. Feiner
                                                Deputy Attorney General